720 F.2d 909
 33 Fair Empl.Prac.Cas. 238,
32 Empl. Prac. Dec. P 33,890
Leonard WILLIAMS, Sr., et al., Plaintiff-Appellees,
Herbert Allison; Paul Gains; Richard S. Gresh; Nicholas
E. Modarelli; John William Averhart, Jr.; Ismael
Caraballo, Jr.; Objectors-Appellants,
v.
George VUKOVICH; Otis Coney, Sr.; Stanley E. Peterson,
Chief of Police; Richard J. Groucutt,
Administrator; Defendant-Appellees.
 No. 81-3513.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 28, 1982.
Decided Nov. 4, 1983.
 
 Edward N. Sobnosky, Robert P. Milich, Law Dept., John Breckenridge, E. Winther McCroom (argued), Youngstown, Ohio, for defendants-appellees.
 Bernard A. Berkman, Lorraine R. Baumgardner (argued), Berkman, Gordon, Murray & Palda, Cleveland, Ohio, for objectors-appellants.
 Thomas G. McNally, Rocky River, Ohio, for Gutierrez & Velazquez.
 Before ENGEL and KEITH, Circuit Judges, and NICHOLS,* Senior Circuit Judge.
 KEITH, Circuit Judge.
 
 
 1
 In 1976, Black Youngstown policemen filed the present class action against the Mayor of Youngstown, Ohio, the Youngstown Chief of Police, and the Youngstown Civil Service Commission. The Black policemen alleged that the police department's employment practices, particularly their use of unvalidated "qualification" examinations, were racially discriminatory. After five and one-half years of intense negotiations a consent decree finally resolved all hiring and promotion issues. The decree promoted certain minorities, but does not require future qualification examinations to be validated for job-relatedness. Moreover, the decree absolutely prevents minorities from objecting to future hiring and promotion examinations if a certain portion of the minorities who took a particular examination passed. Several members of the plaintiff class objected to the decree. The district court initially held that the decree was unreasonable. Later, however, it granted a motion to stay the decree pending the present appeal. We hold that the decree is illegal and contrary to the public interest because it embodies impermissible waivers of future discrimination claims. Accordingly, we remand this action to the district court for further proceedings consistent with this opinion.
 
 I.
 Background
 
 2
 On January 7, 1976, thirteen Black Youngstown policemen[1] and three Black applicants[2] to the police department ("Plaintiffs") filed the present class action against the Mayor of Youngstown, the Youngstown Chief of Police, and the Youngstown Civil Service Commission ("City") in the United States District Court for the Northern District of Ohio. The complaint alleged that the City had engaged in racially discriminatory hiring and promotion practices in violation of the Fourteenth Amendment and 42 U.S.C. Secs. 1981, 1983, 1985 and 1986. Specifically, Plaintiffs maintained that the City's "qualification" examinations were discriminatory, not job-related, and had a disproportionate impact on minorities. Plaintiffs sought to prevent further promotions until the City adopted qualification standards which would make employment and promotion opportunities "available to Black employees and applicants for employment on the same basis as those opportunities have been available to whites." Plaintiffs also sought back pay, seniority credit, and the creation of an affirmative action program to redress the effects of past discrimination.
 
 
 3
 On March 1, the City answered, denying the allegations of racial discrimination. The City asserted that its examinations "fairly and equitably" tested the candidates for employment and promotion.[3] The City, however, did admit that the following summary accurately described their hiring and promotion practices between 1960 and 1976.[4]
 
 
 4
 In 1976, twenty-five percent of Youngstown's population was Black, yet only twenty of the 295 police officers were Black. Moreover, no Black policeman had been promoted during the fifteen years prior to the date this action was filed. Nineteen of the twenty Black policemen held the rank of patrolman. None of the nine captains, seven lieutenants and forty detectives were Black. The only Black who held the rank of sergeant was promoted prior to 1961.
 
 
 5
 During pretrial proceedings on March 24, the parties agreed to submit written proposals to the court regarding the possibility of an interim settlement or resolution of the case pending a final determination on the merits. The next day the parties entered into a stipulation which prohibited promotions based on promotion examinations which were administered shortly before the action was filed. This stipulation was vacated by agreement of the parties on April 22, 1976. On May 12, plaintiffs filed a motion for preliminary injunction to prohibit the City from making any promotions in the police department. They alleged the promotions would exacerbate the discriminatory effect of the City's employment practices.
 
 
 6
 On June 7, plaintiffs submitted a proposed order which would have required one-to-one hiring. Counsel, however, was unable to respond to the proposed order because he had not discussed it with City officials. The City ultimately rejected the proposal.
 
 
 7
 On June 28, further pre-trial proceedings were conducted in open court. The district court issued a temporary restraining order ("TRO") restraining the City from promoting or hiring any individual. The City, however, was allowed to fill six vacancies which allegedly were necessary to the "health, safety and welfare" of Youngstown. Two of the positions were required to be filled with "[q]ualified Black applicants." The ruling also required the City to file an explanation should it decide not to make the appointments before the expiration of the eligibility lists on December 18. Subsequently, the City disputed the efficacy of the district court's June 28 ruling. Therefore, on November 24, 1976, the district court issued a written order memorializing the temporary restraining order.
 
 
 8
 On January 7, 1977, the City filed an explanation why it had not filled the six vacancies. Allegedly, a financial crisis caused the City to lay off seven existing patrolmen and not fill the twelve vacancies in the authorized strength of the police department. On February 9, a supplemental explanation was filed. It indicated that although many City employees had been laid off, only four patrolmen had been placed on layoff status.
 
 
 9
 Additional pre-trial proceedings were conducted on March 31. The court requested that the parties meet, attempt to resolve disputed issues, and exchange settlement proposals. The parties were not to submit the proposed settlements to the court until an agreement had been reached.
 
 
 10
 On April 20, the court noted that its TRO had prevented several vacancies in the rank of patrolman, sergeant, and detective from being filled. Accordingly, it issued an order vacating the restraining order upon the following conditions. The City must first promote at least two Blacks from the current eligibility list before appointing the next four individuals according to usual procedures. The first of every three persons appointed to the rank of sergeant or detective thereafter was to be a qualified Black.
 
 
 11
 Subsequently, the City received a letter from the Director of the Office of Revenue Sharing, United States Department of the Treasury.[5] The letter condemned the City's use of unvalidated hiring and promotion examinations and stated that their investigation revealed sufficient facts to constitute a prima facie case of racial discrimination. The letter concluded with the recommendation that all qualification examinations be validated and an affirmative action plan adopted. The City apparently took no action in response to this letter.
 
 
 12
 In the spring of 1978, however, the City unilaterally announced that it would administer an entry level examination for the rank of patrolman on May 31. On March 23, plaintiffs filed a motion for preliminary injunction to preserve the status quo. Plaintiffs argued that the non-validated examinations had a disproportionate impact on minorities. Administering the examinations could only further decrease the possibility of adequate minority representation in supervisory ranks in the future. A few days later, the district court held extensive pre-trial discussions with the parties. The parties indicated that some accommodation could be reached concerning the examination. Therefore, the court issued an order directing that the examination be held on June 28, rather than May 31, as originally scheduled. The parties were further directed to "continue their good faith negotiations" and "report the status of the same to the Court on or before June 15, 1978."
 
 
 13
 On June 15, the parties reported that an agreement had been reached on the following aspects of the patrolman's examination: recruitment efforts; patrolman candidate training procedures; and the procedural requirements of taking the examination. Plaintiffs also indicated that they would propose a "settlement decree" after the test results were revealed. The examination was administered as scheduled. Subsequently, the court directed the Civil Service Commission to grade the examination, but to only present the scores to the counsel of record and the court.
 
 
 14
 On August 8, the parties informed the court that an interim consent decree was being drafted to resolve disputed issues concerning patrolmen examinations. On September 20, 1979, the parties presented an interim consent decree ("Interim Decree") to the court.
 
 
 15
 The Interim Decree established two eligibility lists and provided that the examinations would be graded on an academic curve. Non-minorities with passing scores were placed on one eligibility list, and minorities on a separate list. The City was required to appoint in multiples of three, with the first candidate to be a minority. The Interim Decree was not an admission of liability. It was to remain in effect until the promotion lists expired by operation of law or the complement of minority patrolmen equaled the minority participation in the local labor force. The Interim Decree concluded with the following language:
 
 
 16
 The parties to this Interim Consent Decree shall make every and all good faith efforts to resolve this litigation with the entry of a Final Consent Decree. However, should voluntary resolution of all issues prove unattainable, trial of all remaining issues not so resolved is hereby set for Tuesday, January 23, 1980 at 10 a.m.[6]
 
 
 17
 On September 24, the City unilaterally announced that it intended to conduct promotion examinations for the ranks of sergeant, detective, chief of detectives, lieutenant and captain on December 4. Four days later, the Youngstown Fraternal Order of Police Lodge No. 28 ("Union") filed a motion to intervene as a party defendant. The Union asserted that as the exclusive representative of all police officers, it had a legitimate interest in "assuring adequate hiring and promotion standards." The Union also revealed that it had "unofficially and informally participated in the litigation almost since its inception." The Court granted the Union's motion on December 5.
 
 
 18
 On November 15, plaintiffs filed a motion for a preliminary injunction to prevent the City from conducting the promotion examinations. Plaintiffs maintained that the City had not acted in good faith. Allegedly, "[i]t was fully anticipated ... that the question of promotions would be the subject of negotiations and final resolution prior to the need by the defendants to further act in this matter. Otherwise any interim action to be taken during the pendency of this action would be carried out under the auspices of this Court."
 
 
 19
 On December 4, 1979, the City administered promotion examinations for the ranks of sergeant, detective, lieutenant, and captain. Two Blacks took the lieutenant's examination, twelve took the detective's examination, and thirteen took the sergeant's examination. Not one Black received a passing score. By contrast, twenty percent of the non-minorities who took each examination received passing scores. On January 15, 1980, the City promoted eleven non-minority policemen. One of the non-minorities promoted had not been hired until two years after the present lawsuit had commenced.
 
 
 20
 On January 26, plaintiffs filed a motion to vacate the promotions non-minority policemen had received. Plaintiffs maintained the examinations were not validated and had a disproportionate impact on minority employment opportunities. The City responded that the promotion examinations had been administered pursuant to the order of a state court judge. Moreover, the promotions were necessary to meet "the great need to provide the necessary manpower and supervision in the Youngstown Police Department." Finally, the promotions did not adversely affect the interests of minorities. Minority representation had risen from six percent at the inception of this lawsuit to approximately fourteen percent since the entry of the Interim Consent Decree. Moreover, Black patrolmen, Robert Bush and Clarence Green, had recently been promoted to detective, and Leonard Williams to sergeant.
 
 
 21
 On April 1, 1980, the City again asserted that the public interest demanded that it promote additional patrolmen to the ranks of sergeant and detective. On April 7, plaintiffs filed a motion for a preliminary injunction to enjoin the proposed promotions. The next day the court enjoined the City from making any promotions until further notice.
 
 
 22
 A status conference was held on June 13. The discussion focused on resolving the hiring and promotion issues. Three days later the parties indicated that an impasse had been reached on the promotion issues. They further indicated that a consent decree addressing hiring would be prepared, but the promotion issues would have to be tried on August 19, 1980.
 
 
 23
 On June 25, Hispanic patrolmen, Anthony Gutierrez, Joseph A. Velazquez, Ismael Caraballo, Jr., David V. Aguilar and Wanda Cordero, filed a motion to intervene as party plaintiffs. The Hispanics complained that the City had "conducted examinations which have not been validated for job relatedness" and had otherwise discriminated against them on the basis of their race and ethnic background. On August 6, however, David V. Aguilar, Ismael Caraballo, Jr. and Wanda Cordero filed a motion to withdraw from the action. The motion to intervene was granted as to Anthony Gutierrez and Joseph A. Velazquez on May 6, 1981.
 
 
 24
 A status conference was held on December 17, 1980. Negotiations apparently progressed substantially during the fall months. The parties indicated that a final consent decree addressing hiring and promotion would be forwarded shortly. On April 23, 1981, the parties again discussed the progress of negotiations, and the content of the consent decree.
 
 
 25
 On April 30 and May 1, the district court held a series of meetings with the parties. A draft consent decree, complete with certain handwritten interlineations, was displayed to the court. However, it was not until May 4, 1981, that the proposed final consent decree ("Final Decree") signed by plaintiffs, the union and the City, was formally presented to the district court. On that date the Court certified the class,[7] and dissolved its prior orders enjoining the City from promoting individuals from the current eligibility list. The court also advised the parties that the Final Decree would have to be modified to cover the interests of Hispanics. On May 7, the modification was complete and the Final Decree was submitted for approval.
 
 
 26
 On May 8, the parties sent out notices announcing the Final Decree. Legal notice of the proposed settlement was also placed in a newspaper of general circulation in Youngstown for a period of two weeks. Interested persons were given thirty days to review the terms of the decree and file their objections with the court. A hearing was scheduled for June 15, 1981 so interested persons could comment on the record.
 
 
 27
 The Final Decree contains eight sections: Preliminary Matters, Hiring, Promotion, Layoffs, Seniority, Notice, Records and Conclusion. The first three sections are relevant to this action, and are more fully described below.
 
 
 28
 The first section, Preliminary Matters, identifies the plaintiffs, plaintiffs' class, and the defendant-signatories to the decree. The section also articulates the following consequences of entering the decree. First, the decree is the final resolution of all hiring and promotion issues from which no appeal may be taken. Second, the decree is not an admission of liability, nor is it an acknowledgment that the City's employment practices were discriminatory. Third, plaintiffs relinquish their right to obtain monetary or additional relief. Finally, the parties indicate that the decree's remedial measures were agreed upon "for the purpose of avoiding the costs of additional litigation."
 
 
 29
 The section entitled Hiring sets forth the mutually agreed upon procedures for entry level hiring. Specifically, the decree states: "The Defendants and their agents shall not engage in any practice or act which has the purpose or effect of unlawfully discriminating against Black or Hispanic applicants for employment or promotion in the Youngstown Police Department on the basis of their race." Defendants may use any entry level examination provided two conditions are met. The passage rate for minorities must meet or exceed forty-four percent. Minorities and non-minorities must be placed on a separate eligibility list according to their scores. The City must hire candidates in multiples of three with the first candidate selected from the list of eligible minorities. The section is to remain in effect for three years after the decree is approved by the court, until the examination is validated, or until the complement of minority policemen equals the percentage of minority representation in the Youngstown population, whichever occurs first.
 
 
 30
 The Promotion section is also weighted to ensure that minorities receive some representation. The scheme set forth establishes two separate tracks for promotion. One track guarantees a promotion to all thirty-eight non-minorities who passed a December 1979 promotion examination. These non-minorities are to fill all openings created by individuals other than the six minorities promoted under the decree. Minority police officers cannot be promoted, except through the second track, until the list of successful non-minority candidates is exhausted.
 
 
 31
 The second track created six promotional slots for minority members. Blacks are allocated four slots and Hispanics two. Leonard Williams, Sr., Clarence Green, and Anthony Gutierrez are promoted to newly created lieutenant positions. Louis Averhart and James Hughes are selected to fill newly created sergeant and detective positions. B. Franklin Taylor, David Truman, and Joseph A. Velazquez are promoted to fill vacancies created by promotions their colleagues received. Five of the six minorities promoted are named plaintiffs. Openings which occur in the minority slots prior to the next promotional examinations are to be filled with minority police officers.
 
 
 32
 The Promotion section also allows the City to continue to utilize the usual Civil Service procedures and promotion examinations in the future. The City, however, may not use the results of any examination if the district court sustains an objection plaintiffs' counsel has made within ten days after the results were released. Plaintiffs' counsel may not file an objection if the minority passage rate equals the percentage of minority representation in the Youngstown population. The promotion section will remain in effect until the decree has been in effect three years, the promotion examinations are validated, or the complement of minority policemen above the rank of patrolman equals "the proportion of Blacks and Hispanics in the population of Youngstown."
 
 
 33
 On May 7 and 21, named plaintiffs, Samuel E. DuBose, Theodore Gillison, and Ernest D. Paul, Sr., filed objection to the proposed consent decree. On June 8, William W. Johnson, a named plaintiff, also filed an objection to the decree. Johnson maintained that he should have been promoted since he had the second highest score among the minority policemen on the most recent sergeant's and detective's examinations. He urged the court to consider the following language from a proposed consent decree which the City had rejected: "Promotions to the newly created positions shall be filled by taking the standings of the raw score of Blacks in good standing in the Department as they appear on the promotion examination administered on the 4th day of December, 1979 ...."
 
 
 34
 On June 8, a single objection was jointly filed by Herbert Allison, Paul Gains, Richard S. Gresh, Nicholas Modarelli, John Averhart, and Ismael Caraballo, Jr. Gains, Gresh, and Modarelli were officers of the union at the time the motion was filed. Ismael Caraballo, Jr., a Hispanic, had been an intervening named plaintiff until he withdrew from the action approximately one month after he moved to intervene. Herbert Allison and John Averhart are Black patrolmen who apparently refused to join the action when it was initially filed. These individuals collectively alleged the promotion section was faulty for two reasons. First, the section promotes minorities, individuals who have failed the qualifying examination, "to positions for which they have demonstrated that they are not qualified...." Second, the section fails to guarantee that validated testing procedures are used for future promotion examinations.
 
 
 35
 The same day, named plaintiffs Theodore Gillison and Gary Thomas Ford also filed objections to the proposed consent decree. Gillison has more seniority than virtually any other minority patrolman. Ford is an unsuccessful applicant for the position of patrolman.
 
 
 36
 On June 15, the day of the reasonableness hearing, plaintiffs' counsel filed a memorandum in opposition to the various objections which had been filed. The memorandum explained that although each named plaintiff objector did not personally benefit from the decree, the decree was not unreasonable nor the product of collusion. In fact, prior to the entry of the decree, plaintiffs met, discussed the merits of various minority candidates for promotion, and gave some consideration to the scores achieved on the various promotion examinations. Eventually a vote was taken. Apparently it was agreed that the minority policemen identified in the decree should be promoted. The memorandum also noted that William W. Johnson's claim had been rejected by the City because he was on leave. In sum, plaintiffs' counsel argued that the interest of the class should prevail over the personal interests of disappointed named plaintiffs.
 
 
 37
 Plaintiffs' counsel's memorandum also addressed the objection which was jointly filed by several minority and non-minority union members. Initially, the "good faith" quality of the objection was questioned. Allegedly, it was more than coincidence that ranking officers in the union had filed an objection just days after the union signed the Final Decree. The memorandum also asserted that non-minority objectors lacked standing to complain about the settlement, since they were neither class members nor parties to the action. On the merits, plaintiffs' counsel maintained that since the promotion examinations were not validated for job-relatedness, they were not an accurate indicator of "qualification."
 
 
 38
 As the reasonableness hearing on June 15 the district court afforded all interested persons an opportunity to voice their objections to the consent decree. At the conclusion of the hearing, the court deferred ruling on the reasonableness of the decree for two weeks. The court instructed the parties to use this additional time to meet informally and attempt to resolve the objections raised at the hearing.
 
 
 39
 On July 14, 1981, the district court approved the Final Decree. The order stated that the proposed "consent decree is the product of over five years of intensive negotiations" and recited a brief chronology of the events surrounding the entry of the decree. The court then stated:
 
 
 40
 The Court has given a great deal of consideration to the objections raised at the June 15 hearing, and is mindful of the concerns raised at the June 15 hearing. However, in considering whether or not to approve the proposed consent decree, this Court is obligated to act in what it considers the best interests of the community of Youngstown as well as to rectify discriminatory practices within the Police Department.
 
 
 41
 In approving and adopting the consent decree, it is the sincere hope of the Court that within the three years that the consent decree remains in full force and effect, the City of Youngstown will take steps toward preparing validated examinations; however, in the interim, the promotions of the minority officers to positions of rank are in the interests of the justice and the community of Youngstown. Accordingly, these objections are also overruled.
 
 
 42
 On August 11, 1981, objectors Herbert Allison, Paul Gaines, Richard S. Gresh, Nicholas E. Modarelli, John William Averhart, Jr., and Ismael Caraballo, Jr. filed an appeal. Subsequently, the objectors filed a motion for a stay pending appeal.[8] On September 21, 1981, the district court granted the stay pending appeal. The stay suspended the operation of the decree. However, it did not affect the promotions minorities received under the Final Decree. All those promoted under the decree have been serving in those capacities for over a year.
 
 II.
 
 43
 In Stotts v. Memphis Fire Department, 679 F.2d 541 (6th Cir.1982), cert. granted, --- U.S. ----, 103 S.Ct. 2451, 77 L.Ed.2d 1331 (1983), this Court articulated a suggested procedure for approving consent decrees and the applicable law surrounding their entry. Today, we elaborate on the brief outline in Stotts.
 
 A. Nature of Consent Decrees
 
 44
 A consent decree is essentially a settlement agreement subject to continued judicial policing. See Stotts, 679 F.2d at 556; United States v. City of Miami, 664 F.2d 435, 439-40 (5th Cir.1981) (en banc) (Rubin, J.). The terms of the decree, unlike those of a simple contract, have unique properties. A consent decree has attributes of both a contract and of a judicial act. United States v. ITT Continental Baking Co., 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975); Stotts, 679 F.2d at 556. On the one hand, a consent decree is a voluntary settlement agreement which could be fully effective without judicial intervention. See City of Miami, 664 F.2d at 439-40. In this sense the decree merely memorializes the bargained for position of the parties. See United States v. Armour & Co., 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). The defendant has given up the possibility of prevailing on the merits in exchange for granting certain limited affirmative relief to plaintiffs. Moore v. City of San Jose, 615 F.2d 1265, 1271 (9th Cir.1980); Stotts, 679 F.2d at 557. Plaintiffs have exchanged their right to obtain adjudicatory relief which would fully eliminate the effects of discrimination in the past as well as in the future. Id.; Albemarle Paper Co. v. Moody, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). A consent decree, therefore, should be strictly construed to preserve the bargained for position of the parties. See ITT Continental Baking Co., 420 U.S. at 238, 95 S.Ct. at 935; Stotts, 679 F.2d at 557. A court has no occasion to resolve the merits of the disputed issues or the factual underpinnings of the various legal theories advanced by the parties.[9] See Stotts, 679 F.2d at 552; City of Miami, 664 F.2d at 440; Airline Stewards and Stewardesses Assoc. v. American Airlines, 573 F.2d 960, 963-64 (6th Cir.) (per curiam), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); Carson v. American Brands, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981).
 
 
 45
 A consent decree, however, is also a final judicial order. See Carson, 450 U.S. at 84, 101 S.Ct. at 996; United States v. Kellum, 523 F.2d 1284, 1287 (5th Cir.1975); Stotts, 679 F.2d at 557. Judicial approval of a settlement agreement places the power and prestige of the court behind the compromise struck by the parties. See Stotts, 679 F.2d at 557; City of Miami, 664 F.2d at 441. Judicial approval, therefore, may not be obtained for an agreement which is illegal, a product of collusion, or contrary to the public interest. See City of Miami, 664 F.2d at 441. Once approved, the prospective provisions of the consent decree operate as an injunction. See Plummer v. Chemical Bank, 668 F.2d 654, 659 (2d Cir.1982); Carson, 450 U.S. at 84 n. 9, 101 S.Ct. at 996 n. 9; City of Miami, 664 F.2d at 441. The injunctive quality of consent decrees compels the court to: 1) retain jurisdiction over the decree during the term of its existence, Stotts, 679 F.2d at 562-63; 2) protect the integrity of the decree with its contempt powers, Id.; EEOC v. Local Union No. 38, 25 EPD p 31, 553 (N.D.Cal.1981); and 3) modify the decree should "changed circumstances" subvert its intended purpose. See Stotts, 679 F.2d at 561-63; Brown v. Neeb, 644 F.2d 551, 563 (6th Cir.1981).
 
 B. Procedure for Approving Consent Decrees
 
 46
 In Stotts, the suggested procedure for approving consent decrees involved three steps. The proposed decree should be preliminarily approved, interested persons given notice, and a reasonableness determination made after a hearing is held.
 
 
 47
 Initially, a proposed decree should be preliminarily approved. The court should determine whether the compromise embodied within the decree is illegal or tainted with collusion. See Stotts, 679 F.2d at 551; United States v. City of Miami, 614 F.2d 1322, 1330-31 (5th Cir.1980), on reh'g, 664 F.2d 435 (5th Cir.1981); Flinn v. FMC Corp., 528 F.2d 1169, 1173 (4th Cir.1975), cert. denied, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). The court's determination should be based on its familiarity with the issues, the results of discovery, and the character of the negotiations prior to the entry of the decree. Preliminary approval is critical for a decree which is the product of arms-length negotiations. With such approval a decree is presumptively reasonable. See Stotts, 679 F.2d at 551; Metropolitan Housing Development Corp. v. Village of Arlington Heights, 616 F.2d 1006, 1013 (7th Cir.1980); United States v. City of Miami, 614 F.2d at 1333. An individual who objects, consequently, has a heavy burden of demonstrating that the decree is unreasonable. See Stotts, 679 F.2d at 551; Village of Arlington Heights, 616 F.2d at 1014.
 
 
 48
 Notice should be given to all individuals who may be affected by the decree. See Stotts, 679 F.2d at 551; Village of Arlington Heights, 616 F.2d at 1014. Notice can best be given by posting the decree and the procedure for filing a comment in conspicuous locations at the place of employment. Additionally, notice could be given by placing an advertisement in the local newspaper. Members of plaintiff class, however, must receive the "best notice practical under the circumstances, including individual notice to all members who can be identified through reasonable effort." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 315, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). See also Mandujano v. Basic Vegetable Products, 541 F.2d 832, 835 (9th Cir.1976). The acquiescence in the decree must be voluntary and knowing. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 52, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974), cert. denied, 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976); Lyght v. Ford Motor Co., 643 F.2d 435 (6th Cir.1982). All parties should also be afforded a full and fair opportunity to consider the proposed decree and develop a response. Individual circumstances will, of course, dictate the length of time between the notice and the reasonableness hearing. See Stotts, 679 F.2d at 551. Two weeks, however, would appear to be a minimum.
 
 
 49
 The reasonableness hearing is a forum for all interested parties to comment on the proposed decree. See, e.g., Stotts, 679 F.2d at 552; Village of Arlington Heights, 616 F.2d at 1014; Culbreath v. Dukakis, 630 F.2d 15, 23 (1st Cir.1980); City of Miami, 614 F.2d at 1331-34; Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir.1977). The ultimate issue the court must decide at the conclusion of the hearing is whether the decree is fair, adequate and reasonable. Id. The Court has no occasion to determine the merits of the controversy or the factual underpinning of the legal authorities advanced by the parties. See Carson, 450 U.S. at 88 n. 14, 101 S.Ct. at 998 n. 14; Stotts, 679 F.2d at 552; Jackson, 519 F.2d at 1151-52. If the court determines that the decree is problematic, it should inform the parties of its precise concerns and give them an opportunity to reach a reasonable accommodation. See Stotts, 679 F.2d at 554; Miami, 614 F.2d at 1332. The court should articulate its "principled reasons" for rejecting a decree if the accommodation is not satisfactory. See Stotts, 679 F.2d at 554; Miami, 614 F.2d at 1333. In making the reasonableness determination the court is under the mandatory duty to consider the fairness of the decree to those affected, the adequacy of the settlement to the class, and the public interest.
 
 
 50
 The decree must be fair and reasonable to those it affects. See Stotts, 679 F.2d at 552; Airline Stewards and Stewardesses, 573 F.2d at 964. A consent decree may not embody affirmative relief provisions unless the employer has utilized minorities at a rate less than their proportion in the relevant labor market. See Stotts, 679 F.2d at 552; United Steelworkers v. Weber, 443 U.S. 193, 203, 99 S.Ct. 2721, 2727, 61 L.Ed.2d 480 (1979). This identifiable statistical disparity, however, need not be so great as to constitute a prima facie case of discrimination. See Stotts, 679 F.2d at 552 n. 10; Setser v. Novack Investment Co., 657 F.2d 962, 968 (8th Cir.1981). The decree must be temporary in nature and terminate when the under-utilization of minorities has been corrected. See Stotts, 679 F.2d at 553. Valentine v. Smith, 654 F.2d 503, 510-11 (8th Cir.), cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); Detroit Police Officers Ass'n, 608 F.2d 671 at 694-98 (6th Cir.1979); Setser, 657 F.2d at 968-69. The decree also cannot bar absolutely the advancement of qualified persons, or require the discharge of non-minority workers and the replacement with minorities. Id. Affirmative provisions which seek "the same racial proportion among employees as in the labor force will ordinarily be reasonable." See Detroit Police Officers Ass'n, 608 F.2d at 696; Stotts, 679 F.2d at 553.
 
 
 51
 A simple reduction in non-minority "expectations" does not necessarily make a consent decree unfair and unreasonable. The affirmative relief provisions of any consent decree will undoubtedly diminish the expectation of non-minorities. Non-minority expectations are based on the employer's pre-decree employment practices which have caused the under-utilization of minorities the decree is designed to correct. See Stotts, 679 F.2d at 556. Therefore, it is impossible not to adversely affect non-minority expectations and simultaneously correct the under-utilization of minorities. In International Brotherhood of Teamsters v. United States, 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 1856 n. 20, 52 L.Ed.2d 396 (1977), the Supreme Court stated that absent discrimination, the minority utilization should approximate the percentage of minorities in the community. It is not unreasonable for non-minorities' expectations to be reduced to accommodate a level of minority participation which would have occurred absent discrimination. Stotts, 679 F.2d at 556. In assessing the fairness of the decree the court should be aware of the practical observation made in Stotts:
 
 
 52
 An employer, such as the City, is unlikely to have an over-compromising attitude toward affirmative action. Employers recognize, as does the dissent, that an inequitable or overly zealous affirmative action plan may create racial tension in the workplace. The presence of this tension may create dissension and a general non-productive work climate. This unfortunate, but real, potential for non-minority backlash is a potent disincentive which restrains employers from agreeing to "too" sweeping affirmative action. However, it is doubtful that this backlash is any less counter-productive than that created by perpetual discriminatory employment policies. More significantly, such considerations cannot justify failure to sustain an otherwise reasonable consent decree.
 
 
 53
 679 F.2d at 555 n. 12.
 
 
 54
 The court must also evaluate the adequacy of the decree "by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." Carson, 450 U.S. at 88 n. 14, 101 S.Ct. at 998 n. 14. See, e.g., United States v. Trucking Employers, Inc., 561 F.2d 313, 317 (D.C.Cir.1977); Stotts, 679 F.2d at 552; Airline Stewards and Stewardesses, 573 F.2d at 964; Plummer, 668 F.2d at 660. A court may not withhold approval simply because the benefits accrued from the decree are not what a successful plaintiff would have received in a fully litigated case. See Trucking Employers, Inc., 561 F.2d at 317. A decree is a compromise which has been reached after the risks, expense, and delay of further litigation have been assessed. See, e.g., Stotts, 679 F.2d at 557; Moore, 615 F.2d at 1271; Luevano v. Campbell, 93 F.R.D. 68, 86 (D.C.1981). Class counsel and the class representatives may compromise their demand for relief in order to obtain substantial assured relief for the plaintiffs' class. The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs. See Stotts, 679 F.2d at 554; Cotton v. Hinton, 559 F.2d at 1330; FMC Corp., 528 F.2d at 1173. Significantly, however, the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered. See Flinn v. FMC Corp., 528 F.2d 1169, 1173 (4th Cir.1975); Women's Committee v. National Broadcasting Co., 76 F.R.D. 173, 176 (S.D.N.Y.1977). The court should insure that the interests of counsel and the named plaintiffs are not unjustifiably advanced at the expense of unnamed class members. See Plummer, 668 F.2d at 660; Franks v. Kroger Co., 649 F.2d 1216, 1225 (6th Cir.1981), vacated, 670 F.2d 71 (1982). Objections raised by members of the plaintiff class should be carefully considered.
 
 
 55
 Finally, the court should consider whether the proposed consent decree is consistent with the public interest. See City of Miami, 664 F.2d at 441; Village of Arlington Heights, 616 F.2d 1006, 1014 (7th Cir.1980). A consent decree which seeks to enforce a statute must be consistent with the public objectives sought to be attained by Congress. See Patterson v. Newspaper & Mail Deliver's Union, 514 F.2d 767, 771 (2d Cir.1975), cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). Voluntary compliance will frequently contribute to the ultimate achievement of the public objectives. Consent decrees minimize the delay, expense, psychological bitterness, and adverse publicity which frequently accompanies adjudicated guilt. See Village of Arlington Heights, 616 F.2d at 1014.
 
 
 56
 Voluntary settlement is the preferred method of eliminating employment discrimination. The Supreme Court has emphasized on several recent occasions that Congress has expressed a "strong preference" for encouraging voluntary settlement of Title VII actions. In fact, a principal purpose of Title VII is to induce voluntary race-conscious affirmative action. See Stotts, 679 F.2d at 555. In Alexander v. Gardner-Denver Co., the Supreme Court explained as follows:
 
 
 57
 Congress enacted Title VII ... to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin.... Cooperation and voluntary compliance were selected as the preferred means for achieving this goal.
 
 
 58
 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974), quoted in Carson v. American Brands, Inc., 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1980). See also Ford Motor Co. v. Equal Employment Opportunity Commission, --- U.S. ----, 102 S.Ct. 3057, 3064, 73 L.Ed.2d 721 (1982). Decisions emphasizing the preferred role of settlements under Title VII are legion. E.g., Detroit Police Officers Ass'n, 608 F.2d at 690; Stotts, 679 F.2d at 554; Trucking Employers, 561 F.2d at 317; Patterson, 514 F.2d at 771; Flinn, 528 F.2d at 1174; City of Miami, 614 F.2d at 1324; Equal Employment Opportunity Commission v. Safeway Stores, 611 F.2d 795, 799 (10th Cir.1979); Moore, 615 F.2d at 1271; Airline Stewards & Stewardesses Ass'n, 573 F.2d at 964; Equal Employment Opportunity Commission v. American Telephone & Telegraph Co., 556 F.2d 167 (3d Cir.1977), cert. denied, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978).
 
 
 59
 A decree which requires that individual considerations of race be an important factor in personnel decisions may also serve the public interest. Several courts have emphasized that the attainment of racial diversity, particularly in supervisory ranks, is a legitimate interest an employer may pursue. Such diversity will, in the long run, enhance public confidence and productivity as employees recognize that their efforts will be rewarded. The rewards of attaining racial diversity in the workplace are particularly great where the employer is a governmental entity. In Detroit Police Officers Ass'n, supra, Judge Lively, speaking for the Court, explained the benefits of a multi-racial urban police department thusly:The argument that police need more minority officers is not simply that blacks communicate better with blacks, or that a police department should cater to the public's desires. Rather, it is that effective crime prevention and solution depend heavily on the public support and cooperation which result only from public respect and confidence in the police. In short, the focus is not on the superior performance of minority officers, but on the public's perception of law enforcement officials and institutions.
 
 
 60
 608 F.2d at 695-96.
 
 
 61
 Accord Talbert v. City of Richmond, 648 F.2d 925, 929 (4th Cir.1981), cert. denied, 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982); Stotts, 679 F.2d at 553; NAACP v. Allen, 493 F.2d 614, 621 (5th Cir.1974); Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission, 482 F.2d 1333, 1341 (2d Cir.1973), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); League of United Latin American Citizens v. City of Santa Ana, 410 F.Supp. 873, 896-97 (C.D.Cal.1976).
 
 III.
 
 62
 In the present case, the Final Decree is attacked on two grounds. It is argued first that the number of promotions granted minorities is excessive. It is next argued that the decree mandates the promotion of unqualified individuals. See Stotts, 679 F.2d at 553. For the reasons which follow, each of these contentions is without merit.
 
 
 63
 The number of promotions called for in the decree is a reasonable, yet conservative response to the stark exclusion of minorities from meaningful participation in the Youngstown Police Department. In 1976, minorities represented over twenty-five percent of Youngstown's population, but less than eight percent of the city's police force. Virtually all of the minority policemen held the lowest rank in the department; they were patrolmen. On the day the action was filed the highest ranking Black was merely a sergeant. Moreover, no minority had been promoted in the police department for well over a dozen years. Given these employment practices, the affirmative provisions of the Final Decree are a very conservative response to the gross under-utilization of minorities. As this Court stated in Stotts, specific race-conscious hiring and promotion goals may be appropriate elements of consent decrees where the under-utilization of minorities is particularly great. See, e.g., Vulcan Society of Westchester City v. Fire Department of the City of White Plains, 505 F.Supp. 955 (S.D.N.Y.1981) (temporary fifty percent hiring ratio reasonable where minority representation in population is sixteen percent and workforce representation is only four percent); Dennison v. City of Los Angeles Department of Water and Power, 658 F.2d 694, 695 (9th Cir.1981) (a decree which awards fifty percent of all hiring and promotion opportunities to qualified minorities is reasonable); Baker v. City of Detroit, 504 F.Supp. 841 (E.D.Mich.1980) (fifty percent promotion ratio is reasonable).
 
 
 64
 Moreover, arguments that the final decree mandates the promotion of "unqualified persons" is based on a faulty premise. Since the promotion examinations the City has administered are presumptively discriminatory and not job-related, see 29 C.F.R. Sec. 2697.4(D), they can hardly be probative evidence that the minorities who failed are any less "qualified" than the non-minorities who passed.
 
 
 65
 All policemen have a legitimate expectation to be promoted on the basis of their qualifications. Correspondingly, the City has a responsibility to promote only qualified candidates. Ranking candidates according to their performance on a non-job related examination does not necessarily result in the selection of qualified candidates. See Guardian's Ass'n. of New York v. Civil Service, 630 F.2d 79, 100 (2d Cir.1980), cert. denied, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981). Ranking is a valid, job-related selection technique only where the test scores vary directly with job performance. Id.
 
 
 66
 In sum, because of the deficiencies noted, we are without any reliable guidelines by which to determine whether those who have been promoted under the challenged decree are qualified. It is apparent that city officials subjectively evaluated the minorities promoted under the decree. William Johnson, for example, had the second highest score among the minorities on the sergeant's and detective's examinations, yet was not selected. By contrast, Anthony Gutierrez did not take the December 5, 1979 lieutenant's examination, but was promoted to that position. The record, unfortunately, is not as developed as it might have been on the precise factors the City used in their subjective evaluations.[10]
 
 
 67
 The dynamics of running a metropolitan police department in a city with a pluralistic make-up is simply not compatible with the slower pace of judicial review of the plans and policies for running that department. However defective the requirements of the challenged decree may have been, it would be highly inequitable to require those officers who have been promoted under it to revert to their original rank and position merely because we take issue with the manner in which those promotions were accomplished. Especially where as here there is no valid means for ascertaining whether they were the most qualified, there is equally no adequate proof to the contrary. Presumably, the Youngstown Police Department will utilize the traditional mechanisms for maintaining employee performance in the event any of the appointments were flawed.
 
 IV.
 
 68
 The Final Decree is illegal and contrary to the public interest. First, the decree places undue reliance on promotion examinations which had a demonstrably adverse impact on minorities. Second, the decree contains impermissible waivers of future discrimination claims.[11]
 
 
 69
 The Final Decree relies heavily on the December 1979 promotion examinations. Yet, those examinations were clearly discriminatory and had an adverse impact on minorities. See 29 C.F.R. Sec. 1607.4(D). Not a single minority passed a promotional examination, yet the non-minority passage rate was twenty percent. The decree's use of the examination results to exclude some minority policemen from promotion while guaranteeing certain non-minorities promotion is improper. In effect, none of the minority policemen who took the December examinations will benefit from the decree's use of the results, but the thirty-eight non-minorities will so benefit. The Final Decree's adverse impact on minority policemen is improper. Moreover, the decree utilizes the examination results to rank potential promotees within each promotion track. This, too, is improper. Using the examination results in this manner will only tend to penalize those minority policemen who are most susceptible to discrimination.
 
 
 70
 Finally, the hiring and promotion sections of the decree are problematic. These sections waive the ability of minorities to complain about discrimination which may occur in the future. The Uniform Guidelines on Employee Selection Procedures promulgated by the Equal Employment Opportunity Commission provide that a selection rate that "is less than [eighty percent] of the rate of the group with the highest rate will generally be regarded ... as evidence of adverse impact." 29 C.F.R. Sec. 1607.4(D) (1982). Yet, the hiring section explicitly waives the right to object if the minority passage rate is only fifty-five percent of that of non-minorities.[12] The promotion section is similarly problematic. In both instances, it is possible for the minority pass rate to satisfy the decree, but still have a discriminatory impact on minorities. This waiver of future discrimination is impermissible.
 
 
 71
 In Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Supreme Court concluded that there could be no prospective waiver of an employee's rights under Title VII. The Court observed that an individual's right to equal employment opportunities represented a congressional command that each employee be free from discriminatory practices. The prospective waiver of such a right would defeat the purpose behind Title VII. Id. at 51-52, 94 S.Ct. at 1021. In United States v. Allegheny-Ludlum Industries, Inc., 517 F.2d 826 (5th Cir.1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976), the Fifth Circuit held that a consent decree had been entered:
 
 
 72
 The release cannot preclude a suit for any form of relief for subsequent injuries caused by future acts or undertakings the effects of which are equivalent to the otherwise compromised, noncompensable effects of past discrimination covered by the decrees. Thus, the defendants are responsible for their conduct relating to job assignments, tests, qualifications requirements, transfers, layoffs, and collective bargaining to the extent these items are carried out after April 12, 1974. If the defendants engage in new discrimination (of course they deny that they have engaged in any heretofore), they will be fully liable for its provable effects and for provable economic losses caused thereby, regardless whether complaining employees signed releases as to other claims.
 
 
 73
 Id. at 854-55. See United States v. Trucking Employers, Inc., 561 F.2d 313, 319 (D.C.Cir.1977). While the present action was not brought pursuant to Title VII, we hold that the principles of Alexander and Allegheny-Ludlum Industries apply with equal force to the present case.
 
 
 74
 Remedial action which mitigates the disparate impact a qualification examination has on minorities is not sufficient to overcome the individual discrimination which minorities who did not pass the examination suffered. The hiring provision is not saved by the requirement that one out of every three hired be a minority who passed the qualification examination. Nor is the promotion section saved by remedial action the district court may take to mitigate the discriminatory impact of a non-validated qualification examination. In Connecticut v. Teal, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982), the Supreme Court explained that the discriminatory impact resulting from a discriminatory testing procedure is not cured by an ad hoc arbitrary promotion of minority applicants in sufficient numbers to achieve some sort of "bottom line" racial balance. The Teal plaintiff had failed a non-validated promotion examination which had a disparate impact on minorities. The employer subsequently used a remedial selection procedure which ensured that significant numbers of minorities would be promoted to supervisor. These selection procedures prevented the "bottom line" number of minorities selected for promotion from reflecting the disparate impact the examination had on minorities. The Supreme Court rejected the bottom line approach and focused on the discrimination each minority individual suffered. The Court held that this individual discrimination would not be abated unless the examination which caused the discriminatory impact was eliminated from the selection process:
 
 
 75
 The suggestion that disparate impact should be measured only at the bottom line ignores the fact that Title VII guarantees these individual respondents the opportunity to compete equally with white workers on the basis of job-related criteria. Title VII strives to achieve equality of opportunity by rooting out "artificial, arbitrary and unnecessary" employer-created barriers to professional development that have a discriminatory impact upon individuals. Therefore, respondents' rights under Sec. 703(a)(2) have been violated, unless petitioner can demonstrate that the examination given was not an artificial, arbitrary, or unnecessary barrier, because it measured skills related to effective performance in the role of Welfare Eligibility Supervisor.
 
 
 76
 In sum, respondents' claim of disparate impact from the examination, a passfail barrier to employment opportunity, states a prima facie case of employment discrimination under Sec. 703(a)(2), despite their employer's nondiscriminatory "bottom line" and that "bottom line" is no defense to this prima facie case under Sec. 703(a)(2).
 
 
 77
 Section 703(a)(2) prohibits practices that would deprive or tend to deprive "any individual of employment opportunities". The principal focus of the state is the protection of the individual employee, rather than the protection of the minority group as a whole.
 
 
 78
 It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employee's group.
 
 
 79
 Id. 102 S.Ct. at 2530-36.
 
 
 80
 Accordingly, this action is remanded for trial on the merits unless the parties can submit a consent decree which is free from the deficiencies noted above. The Final Decree is vacated except insofar as the rights of police officers already hired or promoted in reliance upon the terms of the decree will be adversely affected.
 
 
 
 *
 Judge Nichols was an Associate Judge of the United States Court of Claims when this case was argued. He was sitting by designation. On October 1, 1982, he became a member of the newly created United States Court of Appeals for the Federal Circuit, with the title of Circuit Judge, by various provisions of Pub.L. No. 97-164. Judge Nichols assumed senior status October 1, 1983
 
 
 [1]
 The original named plaintiffs were patrolmen Leonard Williams, Samuel L. Dubose, Robert E. Bush, Jr., Clarence Green, Louis Averhart, Theodore Gillison, William W. Johnson, Rodney W. Lewis, Dennis M. Norris, William E. Norris, Ernest D. Paul, Sr., David M. Truman, and B. Franklin Taylor
 
 
 [2]
 The three Black applicants to the police department who served as named plaintiffs were Louis Clinksdale, Gary T. Ford, and Robert Lightfoot
 
 
 [3]
 To be eligible for employment as a patrolman, an individual must be between the ages of twenty-one to thirty-one years, possess a high school diploma or equivalent, and meet certain height, weight and vision requirements
 An applicant who meets these qualifications is permitted to take the written Civil Service examination. An applicant must attain at least a seventy to pass the examination. An applicant must subsequently pass a physical examination, and have his background, character, reputation and general fitness approved. The background investigation covers, among other things, the applicant's credit rating, police record and organizational affiliations. Qualified applicants subsequently are placed on the eligibility list in order of their final score. Three names are presented, in rank order, to the Chief of Police of the City of Youngstown. He has the discretion to select which of the three individuals will fill the vacancy.
 To be eligible for promotion to the ranks of sergeant or detective, an individual must have been employed as a patrolman for a minimum of two years and must pass a written promotion examination. The Chief of Police then appoints in ascending order according to test scores. The Chief of Police decides how many vacancies shall be filled. The procedure for obtaining an appointment to the rank of lieutenant or captain has the same requirements as that for sergeant, except that the applicant need only have spent one year in grade.
 
 
 [4]
 Nine hundred fifteen individuals, two hundred fifteen of whom were Black, took qualifying examinations for patrolman between 1960 and 1975. Sixty-two percent of the non-minorities received passing scores. Ultimately, twenty-seven percent of the non-minorities who passed the examination were eventually hired as patrolmen. By contrast only thirty-nine percent of the Black males even received passing scores, while only twelve percent of the Blacks who passed the examination were eventually hired
 Nine hundred sixty-four applicants took one of the seven promotional examinations administered for the rank of sergeant between 1960 and 1973. Twenty four of the applicants were Black. Although 12.5 percent of the Blacks passed one of the examinations, none were promoted to the rank of sergeant. Non-minorities, by contrast passed the examination at a rate of 26.1 percent and received promotions at a rate of 11.4 percent.
 Six promotional examinations were administered for the rank of detective. Thirty one of the six hundred ninety-three applicants were Black. Non-minorities passed the examination at a rate of twenty-five percent and received promotions at a rate of 19.4 percent. Three Blacks received passing scores, but none were promoted.
 On the date the action was filed only 6.8 percent of the Youngstown Police Department was Black. According to the 1970 census, approximately twenty-five percent of the Youngstown population was Black.
 
 
 [5]
 The letter in part stated:
 On October 5 and 6, 1976, the Office of Revenue Sharing conducted a civil rights investigation of Youngstown, Ohio, pursuant to an allegation ... that the City's Police and Civil Service Commission, excluded Blacks and other minorities through the utilization of an unvalidated written examination. It was additionally alleged that through the use of unvalidated promotional examinations, Blacks were being discriminatorily denied promotions to Sergeant and Lieutenant.
 As a result of the investigation, I have determined that Youngstown, Ohio is in violation of Section 12(a) of the State and Local Fiscal Assistance Act of 1972 and Section 51.52-1.54 of our Rules and Regulations. I am therefore sending you this letter as required by Section 51.59 and providing a copy to Governor James Rhodes.
 As of August 1976, minorities represented twenty-two (or 7.6%) of the 288 uniformed officers of the Police Department, while comprising twenty-five percent of the city's labor force. This underrepresentation is reinforced by the fact that only two Blacks (or six percent) were among the thirty-four officers hired between January of 1975 and August of 1976. Further analysis revealed dramatic minority underutilization as minorities comprised one (five percent) of the eighteen sergeants, one (2.6%) of the thirty-eight detectives, and were nonexistent among the seven lieutenants and seven captains.
 At least one cause of this minority underrepresentation and underutilization in the Police Department can be placed on the written examinations--an integral part of both the hiring and promotional procedures. While sixty-three percent of the 645 White applicants successfully "passed" the department's entrance exams administered between 1960 and 1974, only thirty-nine percent of the 215 Black applicants were successful. The promotion exams exhibit a similar tendency. Twenty-six percent of the 940 White officer applicants passed the sergeant's exam over this same time period, while only twelve percent of the twenty-four Black officers passed. Additionally, the detective exams reveal a twenty-five percent success ratio for the 662 White officer applicants as compared with only a ten percent success ratio for the thirty-one Black officer applicants. It has long been obvious that these exams are eliminating Black applicants at a disproportionate level. Additionally, no evidence was provided the investigators of any attempt to validate these exams in accordance with standards established by the U.S. Equal Employment Opportunity Commission.
 * * *
 All of the previously stated facts are sufficient to establish a prima facie case of employment discrimination based on race and sex against the City of Youngstown, Ohio. It is therefore requested that:
 
 
 [1]
 The City develop an Affirmative Action Plan ... establishing goals and timetables designed to eliminate all minority and female underrepresentation and underutilization
 
 
 [2]
 In addition to the above, both the Police and the Fire Departments are to develop recruitment programs designed to increase the number of minority and female applicants
 
 
 [3]
 All written examinations utilized by the Police and Fire Departments, whether for hiring or promotions, be validated in accordance with standards established by the U.S. Equal Employment Opportunity Commission (29 C.F.R. 1607)
 
 
 [4]
 All sex-designated job titles be eliminated
 
 
 [5]
 Information be provided to this Office which validates as job related several questions utilized by the Police Department in conducting background investigations on applicants on the final eligibility list being considered for employment. These include inquiries about the applicant's marital status, previous marital and divorce history, military arrest record, previous arrest and detention record of the applicant and applicant's family, mental disorder history of applicant's family, foreign travel, and applicant's membership in organizations, "subversive" or social
 * * *
 Sincerely,
 Bernadine Denning
 Director, Office of Revenue Sharing
 The City apparently took no action in response to the suggestions contained in the letter.
 
 
 [6]
 On July 18, 1979, the parties were notified that a trial date of September 26, 1979 had been set. On August 22, trial was rescheduled for October 23. Later, the trial was reset for November 14
 
 
 [7]
 The District court certified the class pursuant to Fed.R.Civ.P. 23(b)(2). The class is defined in the consent decree as follows:
 All past, present and future Black applicants for employment in the Police Department; all past, present and future Black employees of the Police Department who have been discriminated against on the basis of their race and color; and on behalf of all Black persons who would apply or would have applied and completed the processing procedures for employment with the Police Department but for the Defendants' allegedly racially discriminatory hiring and employment practices and reputation therefor.
 Although the Hispanic plaintiffs were not included in the class named in the consent decree, the district court in the sentence following its definition of the class, stated, "[t]he named Hispanic plaintiffs have been admitted to this action as intervening plaintiffs."
 
 
 [8]
 We do not reach the issue of whether Paul Gains, S. Gresh, and Nicholas E. Modarelli have standing on appeal
 
 
 [9]
 For example, in Stotts v. Memphis Fire Department, 679 F.2d 546 (6th Cir.1982), cert. granted, --- U.S. ----, 103 S.Ct. 2451, 77 L.Ed.2d 1331 (1983), this Court held that the strong policy favoring voluntary settlement of discrimination claims compels the entry of a consent decree without determining whether the union seniority system is bona fide. The consent decree, therefore, could modify the seniority system without violating the prohibition contained in International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Id. at 564-65. See also EEOC v. Safeway Stores, Inc., 611 F.2d 795, 801 (10th Cir.1979)
 
 
 [10]
 Leonard Williams, Sr. has been employed by the Youngstown Police Department since March 26, 1970. He passed a sergeant's and detective's examination prior to 1975. In 1976, he also passed both the examinations. He was promoted to sergeant in 1979 as a result of this litigation. The State of Ohio has designated Williams as a "certified instructor" in police work. He has received law enforcement training from the Ohio Peace Officer Training School, Narcotics & Dangerous Drugs Training School, Ohio Peace Officers Criminal Code Training Program and Criminal Investigation School. In 1968, he entered Youngstown State University. His major is law enforcement administration
 Clarence Green has been employed by the Youngstown Police Department since 1965. He passed the detective examination in 1976. He has attended traffic investigation school. In 1973 he entered Youngstown State University. His major was Criminal Justice. He was promoted to detective prior to 1980.
 Louis Averhart has been employed by the Youngstown Police Department since 1969. He received Tactical Unit Training, Ohio Peace Officers Training, and Disaster and Disorder Training. He attended Youngstown State University for at least two years. His major was sociology.
 The present record does not contain meaningful information about the other minority police officers who were promoted.
 
 
 [11]
 The Final Decree is also problematic. It gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members. Most named plaintiffs receive a promotion. Yet, unnamed class members receive little more than the slight possibility of a promotion should a vacancy occur in the minority track. This contingency, moreover, will probably never occur. Therefore, the instant case may be analogous to Plummer v. Chemical Bank, 668 F.2d 654 (2d Cir.1982). There, the decree awarded the named plaintiffs cash compensation and promotions. Unnamed class members, by contrast, did not receive back pay awards or advancement in rank. In fact, they received little unless the defendant promoted them in the normal course. The Second Circuit held that the action must be remanded to determine if there was a factual basis for the "grossly disparate benefits" awarded the named plaintiffs. Like the Plummer court we, too, find the benefits awarded the instant named plaintiffs unsettling. We do not, however, hold that the promotions are disproportionate. We simply suggest that the record should contain some justification for future awards which have the appearance of being maldistributed
 
 
 [12]
 The decree would be satisfied, for example, if the percentage of Blacks passing the entrance test is at least fifty-five percent of the percentage of Whites passing the test. The fifty-five percent figure used to illustrate the extent of departure from this decree from the eighty percent E.E.O.C. requirement in 29 C.F.R. Sec. 1607.4(D) (1982) is derived from the provision in the decree at paragraph thirteen that a test may be used if eighty-one percent of Whites pass it while at least forty-four percent of Blacks similarly pass, forty-four percent being fifty-five percent of eighty-one percent