527 F.Supp. 509 (1981)
UNITED STATES of America
v.
STATE OF LOUISIANA.
Civ. A. No. 80-3300.
United States District Court, E. D. Louisiana.
September 8, 1981.
Approval November 30, 1981.
*510 Wm. Bradford Reynolds, Asst. U.S. Atty. Gen., Thomas M. Keeling, Nathaniel Douglas, Howard L. Sribnick, Donald M. Lewis, LeVern M. Younger, Jay P. Heubert, Madeline Chun, Harvey L. Handley, III, Michael L. Barrett, U.S. Dept. of Justice, Washington, D. C., John P. Volz, U.S. Atty., Louis J. Volz, III, Asst. U.S. Atty., New Orleans, La., for plaintiff.
Mack E. Barham, Charles F. Thensted, Marie O. Riccio, New Orleans, La., for Louisiana State Board of Regents and its Members.
Martin L. C. Feldman, Robert A. Kutcher, Jan M. Hayden, New Orleans, La., for Board of Trustees for State Colleges and Universities and its Members.
W.S. McKenzie, Nancy C. Tyler, Baton Rouge, La., for Board of Supervisors of Louisiana State University and Agricultural and Mechanical College and its Members.
*511 Kendall Vick, La. Asst. Atty. Gen., New Orleans, La., Charles D. Jones, Benjamin Jones, Monroe, La., for Board of Supervisors of Southern University and Agricultural and Mechanical College and its Members.
Henry N. Brown, Jr., for Bossier Parish School Bd.
Daniel E. Becnel, Jr., Reserve, La., for La. State Bd. of Ed.
Thomas N. Todd, Chicago, Ill., Curtis A. Calloway, Baton Rouge, La., for Grambling State Alumni Assoc.
Before WISDOM, Circuit Judge, and SCHWARTZ and WICKER, District Judge.
Further Articulation of Reasons for Approval November 30, 1981.

ORDER AND REASONS FOR APPROVING ENTRY OF CONSENT DECREE
CHARLES SCHWARTZ, Jr., District Judge.
This cause came on for hearing on this date to determine whether the Court should adopt the consent decree of the parties. Amicus Curiae representing Grambling State University concurs. Amicus Curiae The National Association for the Advancement of Colored People and Dr. Gladys W. Milliner representing herself and the class of faculty members of Southern University in New Orleans have filed memoranda urging the Court to reject the compromise.
It has always been a basic premise of our adversary system of justice that settlements of law suits by agreement of the parties are favored. Further, with respect to discrimination cases, a basic philosophy which has become hornbook law is that voluntary compliance is preferable to court action.
This Court has since April 30, 1980 conducted at least eight lengthy pre-trial conferences with the parties in an effort to prepare the case for an orderly trial and to resolve the issues in dispute. It has had the opportunity to review the pre-trial statements and memoranda of the parties as well as the two amicus curiae filings in opposition to the proposed consent decree. Thus, it is cognizant and knowledgeable of the issues and contentions that pertain to this litigation. Moreover, by reason of representations made to the Court it knows that those persons in an adversary position most familiar with the practices involved, including amicus representing Grambling State University, have spent many long hours in hard negotiations.
The law in this Circuit is that a proposed consent decree in a discrimination case is entitled to a presumption of validity unless the Court finds that it is unlawful, unreasonable, inequitable, or contrary to public policy. United States v. City of Miami, Fla., 614 F.2d 1322 (5 Cir. 1980); United States v. City of Alexandria, 614 F.2d 1358 (5 Cir. 1980); accord: State of North Carolina v. Department of Education, No. 79-217-Civ. (U.S.D.C. North Carolina, Raleigh Division).
Apropos the conclusions we reach herein is the language which we borrow from United States v. City of Miami, supra, p. 1333,
"When the remedy that is jointly proposed is within reasonable bounds and is not illegal, unconstitutional or against public policy, the courts should give it a chance to work."
Although the Court will at a later date further articulate the reasons for its conclusions stated herein, it is of the opinion that it would not be appropriate to further delay the parties from implementing the remedies they propose.
Accordingly since the Court finds that the proposed consent decree is not unlawful, unreasonable, inequitable or contrary to public policy it hereby APPROVES same and orders that it be entered by the Clerk of Court as a judgment of this Court.

FURTHER ARTICULATION OF REASONS FOR APPROVAL
This matter came on for hearing September 8, 1981 to determine whether the Court should adopt the consent decree proposed by the parties. The Court entered an order approving the consent decree on said date, and now sets forth, as promised therein, the further articulation of the reasons for its approval.
*512 This is only the latest of many federal cases to secure minority rights in Louisiana's public system of higher education.[1] Although this action was formally commenced on March 14, 1974,[2] the consent decree[3] may be justly regarded as the culmination of negotiations which have extended over twelve years and which have involved almost every branch of state and federal government, as well as a variety of Amici. The consent decree is itself the product of over a year of hard negotiation, and it embodies a comprehensive desegregation plan which "promises realistically to work." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). As we said in our September 8, 1981 order:
When the remedy that is jointly proposed is within reasonable bounds and is not illegal, unconstitutional or against public policy, the courts should give it a chance to work. United States v. City of Miami, 614 F.2d 1322, 1333 (5 Cir. 1980).
Although a trial court ordinarily plays little or no part in overseeing the settlement of a lawsuit, there are certain special situations in which court approval of a proposed settlement is required because important public interests are implicated. United States v. City of Miami, supra at 1330 (and cases therein cited). Consent decrees in discrimination cases require such approval since these cases raise substantial public questions in addition to those which concern the named parties. As noted in our original order, a proposed consent decree in a discrimination case is to be presumed valid by the trial court unless found to be unconstitutional, unlawful, contrary to public policy or unreasonable. United States v. Miami, supra at 1333-1334; Cotton v. Hinton, 559 F.2d 1326 (5 Cir. 1977); see also Armstrong v. Board of School Directors of the City of Milwaukee, 616 F.2d 305 (7 Cir. 1980).
After careful consideration of the contentions of counsel, the record, the law, and the proposed consent decree, the Court determined on September 8, 1981 for reasons therein and hereinafter set out, that the consent decree must be approved.
On March 14, 1974, the Attorney General commenced this action on behalf of the United States pursuant to the provisions of the Fourteenth Amendment to the Constitution of the United States, and Title VI of the Civil Rights Act of 1964, codified as 42 U.S.C. § 2000d et seq.
In its complaint, the United States alleged: first, that the state of Louisiana and its agencies of higher education had established, maintained and were perpetuating an unlawful dual system of higher education based on race;[4] second, that the defendants were the recipients of substantial federal financial assistance and had agreed to comply with the provisions of Title VI, as well as all the requirements imposed by the regulations of the Department of Health, Education and Welfare issued pursuant to *513 said Title; finally, the United States contended that its continued efforts from January 1969 until the date of the complaint to secure the defendants' voluntary compliance had failed, and that the defendants had steadfastly refused to submit a constitutionally acceptable plan to disestablish the dual system of public higher education. The United States sought injunctive relief, including the formulation and implementation of a detailed desegregation plan whereby the dual system could be promptly and completely dismantled. For their part, the defendants contended[5] (as they had since first contacted by HEW in 1969)[6] that the Louisiana School system of higher education was in full compliance with the provisions of Title VI and the Fourteenth Amendment.
Pursuant to 42 U.S.C. §§ 2000d, 2000d-1 and 28 U.S.C. §§ 1345, 2281, and 2284, a Three Judge Court was convened on March 28, 1974 to hear and determine the case.
Although the Court's involvement remained relatively limited between 1974 and the beginning of 1980, during this period the parties were engaged in discovery, the disposition of several overlapping cases and with certain issues of intervention. See, e.g.: United States v. Louisiana, No. 74-3856 (5 Cir. 1976).
On April 30, 1980, at the first of eight pre-trial conferences, the Court suggested that the parties explore the possibility of settling this action, thereby avoiding the substantial commitment of resources that would be necessary to bring the case to trial and through appeal.[7] The Court reasoned that an early settlement would not only result in a saving of judicial time, but would more importantly, allow the speedy vindication of minority rights. The consensual nature of an approved settlement provides, in comparison with a court order, a much surer foundation for fundamental change, and is much more likely to foster the full acceptance and commitment by all concerned that is necessary for any plan to realize its full potential.
The parties began active settlement negotiations in May of 1980, exchanged a number of settlement proposals, and conducted numerous negotiating sessions. These negotiations intensified in February of 1981, and by August, proposals were being exchanged on an almost daily basis. When accord was ultimately reached, the parties' proposed consent decree was presented and approved by the Court on September 8, 1981.
In approving the consent decree, the Court has carefully considered the provisions of the consent decree itself, the briefs of all counsel (including those of amici), the record, and the law. The factors hereinafter set out substantiate that in this particular action, the consent decree is within reasonable bounds and is not "unreasonable, inequitable, or contrary to public policy." United States v. Miami, supra. The consent decree is therefore entitled to a "presumption of validity," id., and this Court's approval. The Court concludes that:
(A) The consent decree resulted from vigorous arm's length negotiations which were conducted by knowledgeable and experienced counsel. The Court has had many opportunities to become acquainted with counsel during conferences. It has also had ample opportunity to assess counsels' knowledge and skill in pleadings, memoranda, and briefs. The Court is convinced from its own observation, that the consent *514 decree was the product of bona fide negotiations conscientiously conducted by capable attorneys.
(B) The record reflects that during the course of seven and a half years, the parties, counsel, and this Court have each devoted hundreds of hours to these proceedings. Substantial litigation expenses have been incurred by all the parties to this lawsuit. If this suit is not settled now, it might be several years, including appeals, before this matter could be resolved. The real victims of such delay would be those who stand to benefit most from the consent decree: minority students and traditionally Black colleges.[8] The sooner that the measures contained in the consent decree designed to enhance Black colleges and speed the integration of the Louisiana system are implemented, the better.
(C) It is difficult to speculate about the precise injunctive relief this Court would have fashioned if the action had gone to trial and the plaintiff prevailed; however, the Court notes that the desegregation plan embodied in the Consent Decree is substantially similar to that which the parties might have formulated pursuant to a Court Order subsequent to factual findings by this Court of a history of de jure segregation. The Court further notes that a desegregation plan arising in the context of a consent decree enjoys substantial advantages over an identical plan formulated pursuant to a court order. Implementation is likely to be more effective and acceptance speedier where, as here, the plan is not the result of a command from a court, but is rather, the result of conscientious effort and cooperation among educators, federal and state officials, in conjunction with responsible members of the community.
(D) The plan itself appears to be a sound one for achieving a unitary system of public higher education within a Constitutionally acceptable timetable. The Consent Decree provides a reasonable and comprehensive statewide approach to both the systematic integration of the Louisiana higher educational system, and the enhancement of its traditionally Black institutions.[9]
The Court, in evaluating the plan, has taken cognizance of the well recognized and important differences between higher education and elementary or secondary education. Geier v. Dunn, 337 F.Supp. 573, 578-580 (M.D.Tenn.1972); Adams v. Richardson, 480 F.2d 1159, 1164 (D.C.Cir.1973); Norris v. State Council of Higher Education, 327 F.Supp. 1368, 1373 (E.D.Va.1971) aff'd per curiam, 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971); Sanders v. Ellington, 288 F.Supp. 937, 943 (M.D.Tenn.1968); see also, the Revised Criteria Specifying the Ingredients of Acceptable Plans to Desegregate State Systems of Public Higher Education, 43 Fed.Reg. 6658, 6660 (February 15, 1973). Although there is now available a considerable record of experiences which the courts and other agencies of government have had in fashioning remedies for racial discrimination in primary and secondary schools, experience with state systems of higher education is limited and of only recent occurrence. See Adams v. Richardson, supra at 1164. Therefore the Court is, and should be, reluctant to substitute its own judgment for that of the parties, until after the plan here, as well as those proposed in other states,[10] have had a chance to work, or until experience has clearly demonstrated that measures which today seem promising are in fact not so. As educators, the Courts and members of government charged with enforcing anti-discrimination laws move into an unaccustomed area, perhaps all that is clear is that the well tested remedial measures that have proved effective in the context of primary and secondary education, must be abandoned in favor of untested measures more appropriate for *515 eliminating discrimination in a university system.[11]
The Court finds that the Consent Decree's desegregation plan makes specific commitments to (1) shaping the processes of admissions[12] and recruitment;[13] (2) solving the problem of student attrition (especially "other race" students);[14] (3) resolving the issues and problems arising out of program duplication, and the allocation of curricular offerings among the state's institutions;[15] (4) understanding the appropriate role to be played by traditionally Black institutions and making provisions for their immediate enhancement;[16] (6) taking substantial steps to achieve a more equitable balance in the racial composition of the staff, faculty, and governing boards of the university system.
The Consent Decree provides specific goals and timetables for increasing other race participation in every aspect of the university system's life.[17] These are reasonable, specific, and realistic. Happily, there is nothing which indicates the plan will lead to a lowering of academic standards in any way. On the contrary, in the long term, the plan seems likely to allow the system to marshal its considerable resources with considerably greater efficiency in the future than it has done in the past.
The Consent Decree also provides a system-wide reporting system[18] which the Court believes will: (1) promote compliance with the plan; (2) make the process of monitoring the system's progress simple and inexpensive for both state and federal government personnel; and (3) provide all the parties, as well as the general public, a quick and sure means of evaluating the merits of the plan as implemented, and to correct any unsuspected inadequacies which might be revealed thereby.
In summary the Court finds that the consent decree which it approved in its order of September 5, 1981 embodies a reasonable and specific system-wide desegregation plan which promises realistically to work.
NOTES
[1] See for example: Wilson v. Board of Supervisors, 92 F.Supp. 986 (E.D.La.1950); Tureaud v. Board of Supervisors, 116 F.Supp. 248 (E.D.La. 1953); Ludley v. Board of Supervisors of L.S.U., 150 F.Supp. 900 (E.D.La.1957), aff'd 252 F.2d 372 (5th Cir.); McCoy v. Louisiana State Board of Education, 332 F.2d 915 (5 Cir. 1964).
[2] A complaint was filed by the United States on this date in the Middle District of Louisiana against the State of Louisiana, the Louisiana State Board of Education, and forty-two named individuals in their various capacities as officers of the governing boards of the Louisiana higher educational system: The Louisiana State Board of Education, the Louisiana Coordinating Council for Higher Education, the Louisiana State Board of Supervisors, and the Louisiana Board of Regents.
[3] Consent Decree of the parties dated September 8, 1981.
[4] The complaint was subsequently amended to reflect changes made to the governing structure of the Louisiana higher education system. After January 1, 1975, the old governing boards were superseded by four new boards: the Board of Regents, the Board of Trustees for State Colleges and Universities, the Board of Supervisors of Southern University and Agricultural and Mechanical College, and the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College. See L.S.A.Const.Art. 8.
[5] See Answer filed May 10, 1974, ¶ 14, and the defendant's Information for Preliminary Pre-Trial Conference filed May 2, 1980.
[6] Louisiana was one of many states which were the subject of an HEW evaluation of compliance with Title VI. In January 1969, HEW concluded Louisiana was operating a racially segregated system of higher education. Mississippi, Oklahoma, North Carolina, Florida, Arkansas, Pennsylvania, Georgia, Maryland and Virginia were subsequently found to be operating higher education systems in violation of Title VI. See Adams v. Richardson, 356 F.Supp. 92 (D.C. 1973) 94 and generally.
[7] The memorandum submitted by the United States in support of its Motion for Pretrial Conference dated March 13, 1980, contains the suggestion that this action could require twenty trial days.
[8] In particular, Grambling College and the Southern University System.
[9] See Consent Decree, II(7) pp. 17-26.
[10] For example, Oklahoma, North Carolina, Florida, Arkansas, Georgia, Maryland and Virginia.
[11] For example, only under the most extraordinary circumstances would a district court consider compulsory student or faculty assignment in the context of higher education although such remedies have been used in the context of primary and secondary education. See Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala., E.D.1967).
[12] Consent Decree, II(2)(c), p. 4.
[13] Consent Decree, II(2)(D), pp. 4-8.
[14] Consent Decree II(4), pp. 8-9.
[15] Consent Decree II(6) (A-E), pp. 14-16; II(7)(B) (1-3) pp. 18-22; II(7)(C), p. 22; II(7)(E), p. 23.
[16] See Footnote # 9.
[17] See Consent Decree II generally, pp. 2-16.
[18] Consent Decree VIII, pp. 26-28.