Frank J. KELLEY, Attorney General of the State of Michigan, and the State of Michigan, Plaintiffs,

v.

THOMAS SOLVENT COMPANY, Thomas Development, Inc., Thomas Solvent Company of Detroit, Inc., Thomas Solvent Company of Muskegon, Inc., Thomas Solvent, Inc. of Indiana, TSC Transportation, Inc., Richard E. Thomas, and Grand Trunk Western Railroad Company, Defendants.

GRAND TRUNK WESTERN
RAILROAD COMPANY,
Counter Plaintiff,

v.

Frank J. KELLEY, Attorney General of the State of Michigan, and the State of Michigan, Counter Defendants.

GRAND TRUNK WESTERN
RAILROAD COMPANY,
Cross Plaintiff,

v.

THOMAS SOLVENT COMPANY, Thomas Development, Inc., Thomas Solvent Company of Detroit, Inc., Thomas Solvent Company of Muskegon, Inc.,

Thomas Solvent, Inc. of Indiana, TSC Transportation, Inc., and Richard E. Thomas, Cross Defendants (Two Cases).

THOMAS SOLVENT COMPANY and Richard Thomas, Counter Plaintiffs,

v.

GRAND TRUNK WESTERN RAILROAD COMPANY, Counter Defendant (Two Cases).

GRAND TRUNK WESTERN
RAILROAD COMPANY,
Third–Party Plaintiff,

v.

Richard E. THOMAS, as Trustee of The Richard E. Thomas Living Trust, The Richard E. Thomas Living Trust, and Letha Thomas, Third–Party Defendants (Two Cases).

UNITED STATES of America, Plaintiff,

v.

THOMAS SOLVENT COMPANY, Thomas Development, Inc., Thomas Solvent Company of Detroit, Inc., Thomas Solvent Company of Muskegon, Inc., Thomas Solvent, Inc. of Indiana, TSC Transportation Company, Richard E. Thomas,

and

Grand Trunk Western Railroad
Company, Defendants.

Nos. K–86–164; K–86–167.

United States District Court,
W.D. Michigan, S.D.

June 5, 1989.

See also 714 F.Supp. 1439.

John S. Smietanka, U.S. Atty. by Julie Ann Woods, Asst. U.S. Atty. Grand Rapids, Mich., Joel M. Gross, and Steven J. Willey, Environmental Enforcement Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for the U.S. (Roger Grimes, Asst. Regional Counsel, U.S.E.P.A., Chicago, Ill., and Jessie A. Goldfarb, U.S.E.P.A., Office of Enforcement & Compliance Monitoring, Washington, D.C., of counsel).

Foster, Swift, Collins & Coey, P.C. by Charles E. Barbieri and John L. Collins, Lansing, Mich., for defendants, Thomas Solvent Co. and Richard E. Thomas.

Sullivan, Hamilton & Schulz by James M. Sullivan, Battle Creek, Mich., for defendants, Thomas Development, Inc., Thomas Solvent Co. of Detroit, Inc., Thomas Solvent Co. of Muskegon, Inc., Thomas Solvent, Inc. of Indiana and TSC Transp. Co.

Bodman, Longley & Dahling by Fredrick J. Dindoffer and R. Craig Hupp, and Mary P. Sclawy, Detroit, Mich., for defendant, Grand Trunk Western R. Co.

Bremer, Wade, Nelson & Alt, by Michael D. Wade, Grand Rapids, Mich., for Great American Surplus Lines Ins. Co., intervening non-party and non-participant.

Frank J. Kelley, Atty. Gen. by Robert P. Reichel, Asst. Atty. Gen., Environmental Protection Div., Lansing, Mich., for the State of Mich.

## OPINION

ENSLEN, District Judge.

Plaintiffs, the United States and the State of Michigan, move this Court for entry of a partial consent decree with defendant Grand Trunk Western Railroad Company ("Grand Trunk"). Grand Trunk concurs in the motion and requests that the consent decree be entered. Responding to plaintiffs' motion as well is a group of approximately ninety corporations who have been permitted to submit an amici curiae brief on this motion. The amici are essentially those corporations which may incur liability for contamination at the Annex, one of four locations involved in contributing to the pollution at the Verona Well Field in Battle Creek, Michigan.

Plaintiffs lodged the partial consent decree with the Court on October 15, 1988. That partial consent decree would resolve the claims of the United States and the State of Michigan against Grand Trunk for certain past costs incurred in response to the contamination of the Verona Well Field. In brief, the consent decree provides that defendant Grand Trunk will reimburse the plaintiffs for approximately 75% of their response costs. The consent decree also contains findings of fact and declarations as to future liability for additional costs in the ongoing governmental response action at the Verona Well Field area.

### Background

In the underlying actions here, which have been consolidated for pretrial and trial proceedings, the plaintiffs assert claims under Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, for the recovery of response costs incurred in connection with the contamination of the Verona Well Field and surrounding areas. Plaintiffs seek response costs incurred to date and a declaratory judgment that defendants are liable for costs in the future. Defendants are the Thomas Solvent Company; the Thomas Solvent spinoff corporations; Richard E. Thomas; and Grand Trunk.

The Verona Well Field is the primary public water supply source for Battle Creek, Michigan, and serves some 35,000 residential, commercial, and industrial customers. In mid–1981, the Michigan Department of Public Health discovered that the Well Field was contaminated with various organic solvents. The federal and state agencies identified three sources of the contamination. Two of the sources were facilities that had been operated by defendant Thomas Solvent Company, which until its bankruptcy in 1984, had been a distributor of industrial solvents.

One of the Thomas Solvent facilities, the Raymond Road facility, was owned by Thomas Solvent Company and was its primary facility in the Battle Creek area. Neither plaintiff alleges that Grand Trunk is involved in any way with the Raymond Road facility. The second Thomas Solvent facility, the Annex, was owned by Grand Trunk and leased to Thomas Solvent Company. The Annex was used for offloading of railroad tankcar shipments of solvent and storing and loading solvents. The third source of contamination is the Grand Trunk Marshalling Yard, owned and operated by Grand Trunk for the cleaning and maintenance of rail equipment.

The Raymond Road facility and the Annex are close together and form a single plume of contamination, called the Southern Plume. The Marshalling Yard forms the second plume, called the Eastern Plume. It is not possible to quantify precisely the contaminate contribution from each plume or source. Plaintiffs report that while the Raymond Road facility contributes more than the Marshalling Yard,

the Yard is closer to the Well Field than either of the other sources.[1]

Section 107 of CERCLA imposes liability on present and former owners or operators of facilities from which hazardous contaminants have escaped. Under this CERCLA claim, Grand Trunk is being sued singly as an owner and operator of the Marshalling Yard and as an owner of the Annex along with Thomas Solvent Company as the operator. Both Grand Trunk and Thomas Solvent Company are likewise asserted to be jointly and severally liable for the cleanup of the Verona Well Field. Thomas Solvent Company is being sued for the Raymond Road cleanup.

*Response Actions*

Since 1982, the United States, principally through the Environmental Protection Agency ("EPA"), and since 1981, the State, through the Department of Natural Resources ("MDNR") and the Department of Public Health ("MDPH"), have been engaged in response actions concerning the Verona Well Field area. The Verona Well Field is listed on the National Priorities List which was established by EPA under § 105 of CERCLA and consists of the sites in which the release of hazardous substances present the greatest threat to public health and the environment. The main components of the response actions are as follows.

Because of the threat posed by private well contamination in the Verona Well Field area, EPA implemented a bottled water program for area residents. While a water supply system was constructed for the affected area, this bottled water was available at a cost to EPA of approximately $30,000.

Since 1983, EPA has conducted remedial investigation and feasibility studies to determine the extent of the contamination and the remedial options. The first phase of these studies was completed in 1984, yet some are still ongoing. The Initial Remedial Measure ("IRM") began in 1984 and the City can now produce 22 million gallons of uncontaminated water per day, sufficient to meet peak demand levels. EPA paid for 90% of the construction costs of the IRM with the State of Michigan contributing 10% as required by CERCLA.[2] All defendants, including Grand Trunk, were alleged to be jointly and severally liable for the costs of the plaintiffs' joint response actions for the Well Field itself.

In early 1985, the United States and the State conducted remedial action at the Raymond Road facility on both soil and groundwater contamination. The Raymond Road facility had by far the highest levels of contamination and was therefore the first source attacked for purposes of source control measures. Because Grand Trunk is not alleged to have any liability for the Raymond Road facility, no claim is made against it for these particular costs.

EPA, the Agency for Toxic Substances and Diseases Registry, and the MDPH have also studied the effects of groundwater contamination on the health of Battle Creek residents. The study, not yet complete, is expected to conclude with a final report shortly. The costs associated with the study were omitted from the settlement with Grand Trunk, to be dealt with at a future date.

Both the United States and the State have expended costs in the pursuit of these actions, including costs incurred by the United States Department of Justice and the Michigan Attorney General's Office. As appropriate under CERCLA, the governments seek recovery of these costs. Such costs have been included in the proposed Grand Trunk settlement.

The State has taken a number of other response actions at the Verona Well Field site, in addition to those described above.

---

1. *See, e.g.,* Tables 4–5, 4–6, and 4–8 from the *Draft Remedial Investigation, Volume I Report, Verona Well Field, Battle Creek, Michigan (March 1987),* which summarize the concentrations of contaminants present in the soils of the Raymond Road facility, the Annex, and the Marshalling Yard.

2. *See* Affidavit of Jonas Dikinis for a more detailed description of the response actions by both governments.

For example, the State of Michigan, through MDPH and MDNR, performed laboratory analyses of water and soil samples, investigated the extent and sources of contamination, and provided temporary shower facilities to area residents with contaminated private water supplies. A number of these costs are subject to the proposed settlement with Grand Trunk. Some are not; for instance, the costs associated with natural resource damages, which will be handled at a later date.

Remaining then, are source control measures at the Annex and the Marshalling Yard, and a permanent remedial action for the Well Field itself. This also, of course, is not yet completed and will be dealt with at a later date.

### Relevant Litigation

The United States and the State of Michigan commenced these cost recovery actions in May 1986. The pretrial activity since that time has been intense, to say the least. The parties have taken depositions of over 70 witnesses and filed numerous substantive and discovery motions. Plaintiffs have pending motions for summary judgment on remaining liability issues, including the CERCLA liability of defendant Grand Trunk. While not contesting liability as to the Marshalling Yard, Grand Trunk has opposed summary judgment, generally focusing on two issues. First, that Grand Trunk should not be liable for the Annex, because it had leased that facility to defendant Thomas Solvent Company which operated beyond the property actually leased.

Second, Grand Trunk has asserted that its liability for the Well Field should not be joint and several, but should be apportioned based on Grand Trunk's contribution to the Well Field contamination.[3]

The trial in these actions has been divided into two phases, pursuant to an Order of Bifurcation. Phase I will cover liability issues and all past costs of the governments, except in three specified categories:

1. Costs incurred after various cutoff dates around July 1987. Such a cutoff was necessary to allow the parties to prepare for trial on set items of costs that would not continuously expand as trial approached.

2. Costs of the Health Assessment, which is not yet complete.

3. Costs incurred by the Department of Justice and the Michigan Attorney General's Office in connection with this action.

Phase I of this trial is scheduled for the Court's November 1989 trial term.

In another relevant case, Grand Trunk filed a separate action in December 1987 in the Western District of Michigan against some ninety companies which, Grand Trunk alleged, also were liable under CERCLA for the Verona Well Field contamination problem. In *Grand Trunk Western Railroad Co. v. Acme Belt Recoating, Inc.*, No. K87–364 (W.D.Mich.), Grand Trunk alleged that these defendants generated waste materials which had been stored at the Thomas Solvent facilities.[4] To date, neither the

---

3. *See* Opinion, Nos. K86–164, K86–167, at 14–15 (March 7, 1989) (Grand Trunk apportionment defense).

4. In December 1987, Grand Trunk filed a separate action (the *Acme* action), in this Court against approximately ninety (90) companies, which, Grand Trunk alleged, also had liability under CERCLA with respect to the Verona Well Field matter. These defendants were alleged to be parties who had generated waste materials which had been stored at the Thomas Solvent facilities. Grand Trunk moved to consolidate the *Acme* action with these actions. The governments opposed the motion on the grounds that consolidation would unduly delay resolution of these actions. The *Acme* defendants also opposed consolidation. The motion for consolidation was denied by Judge Gibson,

before whom the *Acme Belt* action is pending, on February 24, 1988.

The *Acme* defendants also sought and obtained a stay of all activities, including discovery, in that action. A copy of the "Motion to Dismiss or, In the Alternative, To Stay the Action," and accompanying memorandum, filed by a group of *Acme* defendants—the very same group that has submitted the General Foods Comments. In that motion, it was argued that the *Acme* action, in which Grand Trunk sought to have the Court determine the relative contributions of it and the *Acme* defendants, should be stayed pending resolution of the governments' actions.

The governments have to date not commenced any cost recovery actions against any of the *Acme* defendants, nor have they determined whether such claims will be asserted in the

United States nor the State has commenced a cost recovery action against the defendants in *Acme Belt*. During 1988, defendant Grand Trunk and certain *Acme Belt* defendants conferred with plaintiffs in this action about the possibility of settlement. In April 1988, a settlement meeting took place in Detroit, Michigan and the following individuals attended: counsel for the United States, the State of Michigan, Grand Trunk, Thomas Solvent Company, certain Thomas Solvent insurers, and Antoinette Beuche who listed herself as counsel for 42 *Acme Belt* defendants. Likewise, another meeting was held in Washington, D.C. in June 1988 at the law firm of Patton Boggs and Blow, counsel for a number of *Acme Belt* defendants. That meeting was attended by counsel for the United States, the State of Michigan, and Grand Trunk, and four attorneys representing a number of *Acme Belt* defendants. No settlement proposal has ever been made to the United States on behalf of the *Acme Belt* defendants. Declaration of Joel Gross, at 4 (Dec. 12, 1988). Settlement negotiations continued between plaintiffs and defendant Grand Trunk, leading to the partial consent decree lodged with this Court on October 15, 1988.

### Partial Consent Decree

The settlement reflected in the Partial Consent Decree provides for resolution of the governments' claims against Grand Trunk for all past costs, except those of the Health Assessment. Apart from the Health Assessment, the United States' claim against Grand Trunk for past costs through July 1988 [5] total $6,274,236. That amount can be divided as follows:

| | |
|---|---|
| Costs incurred by EPA | $4,645,773[6] |
| (Interest on the foregoing through September 30, 1988) [7] | 728,254 |
| Department of Justice costs relating to the litigation [8] | 842,684 |
| (Interest on the foregoing through September 30, 1988) | 57,535 |
| Total | $6,274,236 |

The claim of the State of Michigan against Grand Trunk for past costs not including the Health Assessment total $809,995.

In resolution of these claims, Grand Trunk will pay the United States $4,705,677, or exactly 75% of the total claim (Partial Consent Decree ¶ IV. A). The reimbursement to the United States will be made in two installments. Two-thirds will be paid within 10 days of entry of the decree. The remaining one-third, with interest thereon, will be paid within one year after entry of the decree.[9] Payments to the United States will be to EPA's Hazardous Substance Superfund (Partial Consent Decree ¶ IV. C), so that the funds can be used for response actions at this or other sites.

The State of Michigan will also receive 75% of its costs, a payment of $607,490 (Partial Consent Decree ¶ IV. B). The State will receive its payment in full within ten days of entry of the decree.

In exchange for the foregoing payments, Grand Trunk, will receive a covenant-not-to-sue, limited to past response costs only (Partial Consent Decree ¶ V). The covenant-not-to-sue will run to the "Grand Trunk Entities" defined as Grand Trunk, two parent corporations, and their officers,

future. Governments' Memorandum in Support of Partial Consent Decree, at 13–14 (Dec. 22, 1988).

5. Although July 1988 cutoff was used, earlier cutoff dates were used for certain items of costs depending on the periods through which various contractors billed.

6. This number does not include the costs of the Health Assessment, which is excluded from the settlement, nor does it include Raymond Road Facility Costs, since Grand Trunk has not been sued for those costs.

7. Section 107(a) of CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986, provides for the recovery of prejudgment interest.

8. Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), defines "response" to include enforcement costs.

9. The interest will be at the rate earned by the investments of the Hazardous Substance Superfund, the fund from which the response costs were disbursed and to which the recoveries will be deposited (Partial Consent Decree ¶ IV.E).

directors, agents, servants, employees and successors. The covenant-not-to-sue specifically excludes claims for costs incurred after the cutoff dates used in calculating the government's claims [10] and costs of the Health Assessment. It also excludes claims for damages to natural resources and claims for injunctive relief. The only future costs within the scope of the covenant will be enforcement costs related solely to pursuit of claims against other parties. The covenants-not-to-sue will become effective upon payments of all sums owed the governments by Grand Trunk (Partial Consent Decree ¶ V. D).

The decree provides (Partial Consent Decree ¶ V. E) that, as provided in Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), upon entry by the Court of the decree, Grand Trunk will not be liable to other parties for contribution regarding the costs covered by the decree.[11] It further provides that the decree is not intended as a covenant-not-to-sue or release of claims by the United States or the State against any parties other than the Grand Trunk Entities.

The decree makes clear that it will in no way limit the governments' response authorities (Partial Consent Decree ¶ VI). It also provides that Grand Trunk will make no claims against the Superfund for recovery of any of its costs (Partial Consent Decree ¶ VII).

In addition to resolving claims for past costs, the decree would, if approved, also resolve most issues relating to Grand Trunk's liability for future costs. Paragraph VIII contains various "Findings of Fact and Declarations as to Future Liability." That Section provides that Grand Trunk will be liable for future costs as to the Marshalling Yard, the Annex and the Verona Well Field. Grand Trunk retains its right to contest particular items of costs, to contest the application of joint and several liability with respect to the Annex and the Well Field (Partial Consent Decree § VIII. E), and to assert the defense set forth in Section 107(b)(3) of CERCLA in certain very limited circumstances (Partial Consent Decree VIII. F).

*Public Comments*

The proposed consent decree in this case was lodged with the Court on October 15, 1988, after which there was a 30–day period during which the United States Department of Justice received public comments on the proposed decree. More specifically, the United States provided notice of its settlement with Grand Trunk in a *Federal Register* notice on October 21, 1988.[12] *See*

10. This date was June 30, 1988 as to the State. As to the United States, it varied based on when various contractors invoiced, but in all cases was prior to June 30, 1988.

11. This provision of the Decree is the subject of significant commentary and is discussed in detail *infra.*

12. The notice reads in pertinent part:
Notice is hereby given that a proposed Partial Consent Decree in *United States v. Thomas Solvent Company, et al.*, Civil Action No. K–86–167 (W.D.Mich.), between the United States, on behalf of the Environmental Protection Agency ("EPA"), and Grand Trunk Western Railroad Company ("Grand Trunk") has been lodged with the United States District Court for the Western District of Michigan. The Partial Consent Decree resolves the claims of the United States (as well as related claims of the State of Michigan which is also a party to the Decree) against Grand Trunk under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9602 et seq., for certain response costs incurred by the EPA in responding to the

contamination of the Verona Well Field, the public drinking water supply for Battle Creek, Michigan. Under the settlement reflected in the Partial Consent Decree, Grand Trunk will pay $4,705,677 in reimbursement of certain response costs incurred prior to July 1, 1988. The Partial Consent Decree also contains certain findings of fact and declarations of liability as to Grand Trunk's liability with respect to the continuing Verona Well Field response actions.
The Department of Justice will receive comments relating to the proposed Partial Consent Decree for 30 days following the publication of this Notice.
Paragraph X of the proposed Decree provides that "final approval by the United States of this Partial Consent Decree is subject to receipt of public comments by the Department of Justice during a 30 day comment period following publication of notice of this Partial Consent Decree in the Federal Register." While consideration of public comments on a settlement of this type is not required by statute or regulation, it should be noted that Section 122(i) of CERCLA, 42 U.S.C. § 9622(i), does provide for a public

53 Fed.Reg. 41,424 (Oct. 21, 1988). Pursuant to that notice, the amici on this motion filed timely comments with the Department of Justice during November 1988. Response of Amici Curiae, at 10–11 (Jan. 20, 1989).

The Court will review the two sets of comments received pursuant to the *Federal Register* notice, as well as the discussion in the Response of Amici filed in this Court on January 20, 1989. To begin with, the first set of comments, the General Foods comments, argue for the addition of a "comparative fault" provision in the decree. The commenters suggest that should the governments bring claims against them in the future for recovery of sums not obtained from Grand Trunk, Thomas Solvent Company, or the Thomas Solvent spinoffs, the governments' claims should be reduced not by the $4,705,677 and $607,490 which Grand Trunk will pay to the United States and the State, respectively, but instead should be reduced by the greater of the amounts recovered from Grand Trunk and the share of liability reasonably allocable to Grand Trunk. In essence, this assertion would use the 1977 Uniform Comparative Fault Act as the basis of a federal common law rule of decision for a CERCLA settlement. The amici also make this the major part of the argument in their January 1988 Response.

In the second set of comments, the Addison Products comments, the commenters likewise fear that Grand Trunk may not be obligated to pay its fair share of the response costs. They believe that it is unfair to require them to sort through volumes of discovery to develop their objections.[13]

The amici request that if the Court declines to apply comparative fault principles and agrees with the governments that CERCLA instead incorporates terms from the Uniform Contribution Among Tort-feasors Act, that the Court order a fairness hearing. The General Foods commenters also make this request. Then, before the hearing is convened, the amici suggest that they be permitted "a minimum of nine months of discovery." Response of Amici Curiae, at 35 (Jan. 20, 1989).

Finally, the amici ask the Court to adopt what they call the "government apportionment." The amici state that if the Court accepts the government's allocation of harm and rules that all the relevant past costs except those associated with the Raymond Road facility have been paid, the amici do not object to entry of the consent decree.

### Discussion

### Nature of a Consent Decree

A consent decree is in essence "a settlement agreement subject to continued judicial policing." *Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir.1983); *United States v. City of Miami,* 664 F.2d 435 (5th Cir.1981) (en banc). The decree is, however, not a simple contract. A consent decree has attributes of both a contract and a judicial act. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975); *Williams v. Vukovich,* 720 F.2d at 920; *U.S. v. State of Michigan,* 116 F.R.D. 655, 661 (W.D.Mich.1987). In one sense, a consent decree could be effective on its own as a voluntary settlement agreement, *Williams,* 720 F.2d at 920; *City of Miami,* 664 F.2d at 439–40. Viewed this way, the decree merely memorializes the bargained-for positions of the parties. *United States v. Armour & Co.,* 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). A defendant has foregone the possibility of prevailing on the merits in exchange for granting some form of limited relief to plaintiff. A plaintiff has ex-

comment period in cost recovery settlements by the United States in cases not referred to the Department of Justice.

**13.** Included with their comments were four requests. They request:
   1) substantiation that 70–75% is Grand Trunk's fair share;

   2) an extension of the 30 day public comment period to develop facts showing that Grand Trunk is responsible for more than 70–75% of past costs;
   3) that Grand Trunk waive its statutory contribution protection; and
   4) a "global" settlement conference.

changed a right to obtain adjudicatory relief for a known recovery sum. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975); *Williams*, 720 F.2d at 920; *Moore v. City of San Jose*, 615 F.2d 1265, 1271 (9th Cir. 1980). The bargained-for position of the parties should be preserved when possible by strictly construing the terms of the decree. *ITT Continental*, 420 U.S. at 238, 95 S.Ct. at 935. In addition, the Supreme Court had said:

> [T]he *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.

*United States v. Armour & Co.*, 402 U.S. at 681, 91 S.Ct. at 1757 (emphasis in original).

A consent decree, however, especially one that impacts the interests of the public and specific groups of persons not party to the decree, is more than a simple contract. It is also judicial order and a continuing decree of injunctive relief. *Carson v. American Brands*, 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981); *Williams*, 720 F.2d at 920; *United States v. Kellum*, 523 F.2d 1284, 1287 (5th Cir. 1975). It may be said that "judicial approval of a settlement agreement places the power and prestige of the court behind the compromise struck by the parties." *Williams*, 720 F.2d at 920; *City of Miami*, 664 F.2d at 441. The consent decree will therefore not be approved where the agreement is illegal, a product of collusion, inequitable, or contrary to the public good. *See United States v. City of Jackson*, 519 F.2d 1147, 1151 (5th Cir.1975); *City of Miami*, 664 F.2d at 441.

■ Once the consent decree is approved, the consent decree's prospective provisions operate as an injunction. *Carson*, 450 U.S. at 84 n. 9, 101 S.Ct. at 996 n. 9; *Plummer v. Chemical Bank*, 668 F.2d 654, 659 (2d Cir.1982); *City of Miami*, 664 F.2d at 441. The Court may then retain jurisdiction over the term of the decree's

existence; protect the integrity of the decree with its contempt power; and, in addition, modify the decree should changed circumstances subvert its original purpose. *Williams*, 720 F.2d at 920; *Brown v. Neeb*, 644 F.2d 551, 563 (6th Cir.1981).

### Judicial Review of the Consent Decree

■ Review of a consent decree is committed to the informed discretion of the trial court. *See United States v. Hooker Chemical & Plastics Corp.*, 776 F.2d 410, 411 (2d Cir.1985); *United States v. Jones & Laughlin Steel Corp.*, 804 F.2d 348, 351 (6th Cir.1986); *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625–26 (9th Cir.1982). In its exercise of discretion, the trial court should consider the strong policy favoring voluntary settlement of litigation. *See Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117, 1126 (D.C.Cir. 1983); *United States v. Hooker Chemicals & Plastics Corp.*, 540 F.Supp. 1067, 1080 (W.D.N.Y.1982); *United States v. Louisiana*, 527 F.Supp. 509, 511 (E.D.La.1981). The consent decree—as a judicial act—requires court approval. It may approve or reject the consent decree and, although it may suggest modifications, it can only approve or reject the consent decree. *Officers for Justice v. Civil Service Comm'n*, 688 F.2d at 630. The controlling criterion is not what might have been agreed upon or what the court believes might have been the optimal settlement. *Id.* at 625; *Armstrong v. Board of School Directors*, 616 F.2d 305, 315 (7th Cir.1980). Yet, the court must "eschew any rubber stamp approval" in favor of an independent evaluation. *United States v. Seymour Recycling Corp.*, 554 F.Supp. 1334, 1337–38 (S.D.Ind. 1982); *United States v. Hooker Chemicals*, 540 F.Supp. at 1072. At the same time, a court must avoid the detailed investigation required if the parties were actually trying the case.

■ Where a court is reviewing a consent decree to which the government is a party, the balancing of competing interests affected by a proposed consent decree "must be left, in the first instance, to the discretion of the Attorney General." *Unit-*

ed States v. Bechtel Corp., 648 F.2d 660, 666 (9th Cir.), cert. denied, 454 U.S. 1083, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981); see also Sam Fox Publishing Co. v. United States, 366 U.S. 683, 689, 81 S.Ct. 1309, 1313, 6 L.Ed.2d 604 (1961) (the government has the discretion over accepting a consent decree unless there is bad faith or malfeasance); United States v. Associated Milk Producers, Inc., 534 F.2d 113, 117 (8th Cir.), cert. denied, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976) (Attorney General must retain discretion in "controlling government litigation and in determining what is in the public interest"). This principle is particularly important where the consent decree has been negotiated by the Justice Department on behalf of a federal administrative agency "specially equipped, trained and oriented in the field." United States v. National Broadcasting Co., 449 F.Supp. 1127, 1144 (C.D.Cal.1978).

### Public Policy Considerations

"Public policy strongly favors settlements of disputes without litigation." Aro Corp. v. Allied Witan Co., 531 F.2d 1368, 1372 (6th Cir.), cert. denied, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976). As the Court in Aro Corp. stated: "Settlement agreements should ... be upheld whenever equitable and policy considerations so permit. By such agreements are the burdens of trial spared to the parties, to other litigants waiting their turn before overburdened courts, and to the citizens whose taxes support the latter. An amicable compromise provides the more speedy and reasonable remedy for the dispute." Id. See also Autera v. Robinson, 419 F.2d 1197, 1199 (D.C.Cir.1969); Citizens for a Better Environment v. Gorsuch, 718 F.2d 1117, 1126 (D.C.Cir.1983), cert. denied, 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984); United States v. Wood, Wire and Metal Lathers International Union, 471 F.2d 408, 416 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). There is a "clear policy in favor of encouraging settlements ... particularly in an area where voluntary compliance by the parties ... will contribute significantly toward ultimate achievement of statutory goals." Patterson v. Newspaper & Mail Deliverers' Union of New York, 514 F.2d 767, 771 (2d Cir.1975), cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976).

The consent decree is a "highly useful tool for government agencies," for it "maximizes the effectiveness of limited law enforcement resources" by permitting the government to obtain compliance with the law without lengthy litigation. United States v. City of Jackson, 519 F.2d 1147, 1151 (5th Cir.1975). See also United States v. Hooker Chemicals & Plastics Corp., 540 F.Supp. 1067, 1080 (W.D.N.Y. 1982); Moch v. East Baton Rouge Parish School Board, 533 F.Supp. 556, 559 (M.D. La.1980). The use of consent decrees "encourage informal resolution of disputes, thereby lessening the risks and costs of litigation." SEC v. Randolph, 736 F.2d 525, 528 (9th Cir.1984). See also United States v. City of Alexandria, 614 F.2d 1358, 1362 (5th Cir.1980).

### Consent Decrees in CERCLA Litigation

Congress and the courts have identified a series of factors for a court to consider in reviewing a proposed CERCLA settlement. The legislative history for the 1986 amendments to CERCLA establishes that a court's role in reviewing a Superfund settlement is to "satisfy itself that the settlement is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve." H.R.Rep. No. 253, Part 3, 99th Cong., 1st Sess. 19 (1985). This three part test of (1) fairness, (2) reasonableness, and (3) consistency with CERCLA's goals, is similar to the three part test the courts have used in evaluating settlements under CERCLA, prior to the 1986 amendments. United States v. Conservation Chemical Co., 628 F.Supp. 391, 400 (W.D.Mo.1985); United States v. Seymour Recycling Corp., 554 F.Supp. 1334, 1337–38 (S.D.Ind.1982). It also parallels the standard enunciated by the Sixth Circuit for the review of consent decrees generally. See United States v. Jones & Laughlin Steel Corp., 804 F.2d 348, 351 (6th Cir.1986); Williams, 720 F.2d at 920–23.

*Conclusion*

1. *The Partial Consent Decree is Fair and Reasonable*

■ In *United States v. Hooker Chemical & Plastics Corp.*, 607 F.Supp. 1052 (W.D.N.Y.), *aff'd*, 776 F.2d 410 (2d Cir. 1985), the court looked at a number of factors to determine that the terms of a consent decree in an environmental case were, among other things, fair and adequate. A reviewing court, it noted, should consider "the strength of plaintiffs' case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved." *Id.* at 1057. In finding a CERCLA settlement to be fair and entered into in good faith, the court in *City of New York v. Exxon*, 697 F.Supp. 677 (S.D.N.Y.1988), considered that none of the objectors could come forth with evidence—or even conclusory statements—casting doubt on the good faith of the settling parties or the adversarial vigor with which they pursued this litigation. *Id.* In addition, the court in *Conservation Chemical* considered the remedy provided for in the decree and its adequacy in solving the hazards of contamination at the site in its analysis of a decree's reasonableness. 628 F.Supp. at 402–03.

As plaintiffs point out, it is well-settled that liability under CERCLA is joint and several where the environmental harm is indivisible. *United States v. Monsanto*, 858 F.2d 160, 171–72 & n. 23 (4th Cir.1988). With this in mind, I note that defendant Grand Trunk might be liable for all government response costs regarding the Verona Well Field. Even though Thomas Solvent is the operator of two of the three facilities which are identified sources of contamina-

tion, including the Raymond Road facility, Thomas Solvent Company's bankruptcy threatens both the governments and defendant Grand Trunk. Due to this significant risk factor, both the governments and Grand Trunk have chosen to minimize the risk associated with Thomas Solvent Company's insolvency.

Second, under Section 122(e) of CERCLA, EPA is authorized—for settlement purposes—to develop non-binding, preliminary allocations of responsibility. The government should thus look at such factors as:

—volume of contaminants
—toxicity
—mobility
—strength of evidence
—parties' ability to pay
—litigation risks
—public interest considerations
—precedential value of case
—inequities and aggravating factors

While there has been no actual allocation evidence developed here, according to the government, it would be unlikely that Grand Trunk's share would be greater than the 75% it has agreed to reimburse the governments. Given the substantial Raymond Road facility contribution of the Verona Well Field,[14] even if Grand Trunk were 100% responsible for both the Marshalling Yard and the Annex, the total would not likely be over 75%.

The decree here would resolve claims which have been hotly contested, and which, if not settled, would only be resolved after all pending motions were decided, after trial on remaining issues was completed, and after any appeals were heard and decided. Rather than go that

---

**14.** For example, Kenneth Quinn, one of plaintiffs' hydrogeological experts testified at his deposition that the southern plume emanating from the Thomas Solvent facilities and the eastern plume from the Grand Trunk Marshalling Yard had equivalent impacts on the Well Field. *See* Deposition of Kenneth J. Quinn, at 148–49 (Oct. 13, 1987). An EPA study calculated that the Raymond Road facility contributed 68% of the contaminants to the Southern Plume. *See* Raymond Road Operable Unit Feasibility Study, at 1–14 and 1–15, which is also part of the Verona Well Field Administrative Record—10 Thomas

Solvent Operable Unit, at 3200–01. Using these numbers, 50% × 68% would result in a 34% contribution for the Raymond Road facility. While this would be an irrelevant calculation in the joint and several liability, non-settlement calculation in the joint and several liability, non-settlement context, it does provide an illustration for the settlement decision. Moreover, the foregoing calculation is just one way of analyzing the situation, one which Grand Trunk would likely have contested. It does, however, illustrate one argument for the inherent fairness of settlement.

route, the parties have reached a settlement which resulted, plainly and simply, from good-faith arms-length negotiations in which the United States and the State sought to obtain the best possible recovery for the Superfund and State treasury, respectively. Counsel for both governments and Grand Trunk support this settlement agreement after a period of intense litigation. There is no suggestion in any of the comments or elsewhere that the settlement was in any way collusive or that it resulted from anything other than hard bargaining.

I also observe that one primary reason the amici (and commenters) call this decree "unfair" is based on events that may never occur. Thus, the Court is unwilling to set a solution in stone at this point. Because I do not believe this issue of contribution is ripe for resolution, I have not decided it. Thus the 'unfairness' claim of amici is deflated to the point of insignificance. *See* subsection 4, *infra.*

Finally, as to the remedy provided by this consent decree and its relationship to the hazards on the contamination site, the decree is reasonable as it functions exactly as the CERCLA cost recovery action was intended—over $4.7 million dollars will be made available, two-thirds of it immediately, for use by the Superfund, implementing the cost recovery scheme of CERCLA by replenishing the Superfund promptly. Likewise, over $600,000 will be made available to the State of Michigan. Moreover, Grand Trunk's agreement to stipulations relating to its future liability will substantially reduce the need for further litigation with Grand Trunk in the future. The remaining outstanding costs, according to the government, will be pursued—with increased resources—against Thomas Solvent Company and the other defendants in this action.

2. *The Partial Consent Decree is in the Public Interest and Furthers CERCLA's Goals*

■ The partial consent decree implements the specific statutory policies underlying this case and are in the public interest. *See United States v. Hooker Chemi-*

*cal & Plastics Corp.,* 607 F.Supp. at 1057. The goal of CERCLA is "to protect and preserve public health and the environment" from the effects of the release or threatened release of hazardous substances into the environment. *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir.1986); *Lone Pine Steering Committee v. EPA,* 600 F.Supp. 1487, 1489 (D.N.J.), *aff'd,* 777 F.2d 882 (3d Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986).

CERCLA authorizes the United States to secure "a prompt and effective response to problems of national magnitude resulting from hazardous waste disposal." *United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100, 1112 (D.Minn.1982). But while CERCLA authorizes governmental cleanup of hazardous waste sites using money provided by the Superfund, the Superfund is limited and cannot finance cleanup of all the many hazardous waste sites nationwide. *See, e.g.,* Cong.Rec. H11,070 (Dec. 5, 1985) (Statement of Rep. Florio). Indeed, Congress knew when it enacted CERCLA that the costs of response activities would greatly exceed the Superfund. *See* S.Rep. No. 848, 96th Cong.2d Sess. at 17–18 (1980), U.S.Code Cong. & Admin. News 1980, p. 6119, *reprinted* in 2 CERCLA Legislative History at 47, 51. Thus, settlements of CERCLA cases in which the defendants agree to reimburse the Superfund for past expenditures and to undertake work that would otherwise be funded with Superfund money are in the public interest. *See United States v. Conservation Chemical Co.,* 628 F.Supp. at 402–03. Cost effective settlement practices also preserve precious resources of the governments in their efforts to clean up hazardous waste sites as quickly and cheaply as possible. Note, *Developments in the Law—Toxic Waste Litigation,* 99 Harv.L. Rev. 1458, 1511 (1986).

Further, as the court stated in *United States v. Seymour Recycling Corp.,* 554 F.Supp. at 1339:

There is a public interest in encouraging parties to come forward first in an effort to settle enforcement cases. This is con-

sistent with the general policy favoring the compromise of claims.

Consistent with that policy, more favorable settlement terms should be available to responsible parties who come forward and settle early. While Grand Trunk agreed to settle the claims against it after some period of litigation, the fact remains that it is the first liable party to agree to settle claims against it for the cleanup of the Verona Well Field.

### 3. *A Hearing and Further Discovery are Unnecessary*

■ I see no reason to subvert the very purpose of this settlement agreement, which is to avoid the costs of extended litigation, by ordering a hearing on whether the settlement represents the percentage of responsibility that would be adjudicated against Grand Trunk if this case were tried. The amici ask this Court to allow nearly a year of discovery for them to prepare themselves adequately. All this, from my perspective, serving to further increase the costs of litigation—perhaps for no reason and by those who are not even parties in this case.[15]

Following the public comment period and my willingness to allow the response of amici curiae, I see no factual support of unfairness, nor is there any allegation of bad faith or that the decree is contrary to the public interest. Likewise, there is nothing in the comments or amici brief to suggest that the decree is not consistent with the express mandates and goals behind the CERCLA statutory scheme. As to the fairness question, as discussed *supra*, I believe the consent decree is fair, and the choice between comparative fault or contribution under the UCATA is one that simply acknowledges differing policy objectives. Neither one or the other is blatantly unfair, and it may not even be a legal question to be resolved as a matter of federal common law, if, as the governments argue, Congress has already resolved the matter. In

any case, the allegations of unfairness are a moot point, as discussed in subsection 4, *infra.*

### 4. *Comparative Fault Condition*

The amici have moved the Court to enter their order applying principles of comparative fault to limit any judgment ultimately entered against non-settling parties to their proportional share of the liability for harm at the site. More specifically, the amici requests that any shortfall in the amount paid by Grand Trunk should not be included in a potential judgment entered against the non-settling companies.

While both parties have addressed the issue of whether the consent decree should be guided by policies of comparative fault, I need not decide this issue now for it is not ripe for resolution. Neither the United States nor the State has sued one of the amici (or commenters), and the issue is better decided if and when it presents itself. Should one or more of the amici be sued, there would be more facts to consider, certainly a situation preferable to positing with an assortment of ifs. Neither the amici nor the government opposes such a ruling, one that seems clearly the best one. *See* Response of Amici at 12 n. 10 (Jan. 20, 1989); Plaintiffs' Memorandum in Support, at 41 n. 32. I agree, however, with plaintiffs' contention that the decree I am being asked to enter does not address the issue of the effects of the settlement on claims against non-settlers. Thus, no change in the decree is necessary or preferable to communicate this conclusion.

### ORDER

In accordance with the opinion entered June 5, 1989;

IT IS HEREBY ORDERED that the motion to enter the partial consent decree

---

**15.** I believe that the suggestion by the amici that a nine month delay will not prejudice the government is erroneous. The governments have an interest in "rapid recovery" of response costs. *See United States v. Chem–Dyne Corp., 572 F.Supp. 802, 805 (S.D.Ohio 1983).* More-

over, since the amount to be paid by Grand Trunk is fixed, the longer it takes to consummate the Decree the less the present value of the settlement to the governments and the greater the claim for interest remaining against the non-settlers.

between the governments and defendant Grand Trunk is GRANTED.