**HUGULEY, et al., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

No. 83–CV–72864.

United States District Court, E.D. Michigan, S.D.

Dec. 13, 1993.

Cheryl Bloom, Bloom & Bloom, Farmington Hills, MI, for Ruth E. Dunn.

Barbara Berish Brown, Paul, Hastings, Janofsky & Walker, Washington, DC, for defendant.

*OPINION AND ORDER*

FEIKENS, District Judge.

This is the most recent of a series of challenges to the scope and preclusive effect of the consent decree that ended a class action discrimination suit against General Motors Corporation by all black salaried employees in Michigan, Indiana, and Ohio. *See Huguley v. General Motors Corp. (Perry),* No. 83–CV–72864–DT, 1993 WL 276790, 199 U.S.Dist. LEXIS 4134 (E.D.Mich. Jan. 21, 1993); *Thomas v. General Motors Corp.,* 1992 WL 521527, No. 91–CV–76068–DT (E.D.Mich. Jan. 31, 1992). Plaintiff Ruth E. Dunn is a current General Motors Corporation (GM) employee and a member of the class bound by the consent decree. This motion arises because Dunn is suing GM for discrimination in state court, and GM has responded by asking me to enforce the consent decree and to enjoin Dunn's state court discrimination action.

I enjoined similar state court actions in both *Perry* and *Thomas, supra.* Dunn attempts to distinguish these cases, arguing that her claim alleges numerous incidents of discriminatory conduct which took place after the consent decree became effective and which, therefore, are not covered by the consent decree. I grant GM's motion and hereby enjoin Dunn's state court action. My reasons are two-fold. First: the discriminatory incidents that Dunn alleges actually are

effects of past discrimination and, accordingly, are covered by the consent decree.

The second reason is more complicated. In brief, much of the present-day, post-decree evidence that Dunn uses to support her claim of individual, intentional discrimination consists of comparing her own work-related abilities and achievements to those of several white employees who, she claims, are similarly situated. This group-based method of proof admittedly would tend to show that *blacks as a group* are being discriminated against; it would tend to show *group-based* disparate treatment. Still, Dunn presents no evidence showing that she, as an individual, is being singled out from the group of black employees for discriminatory treatment; that is, she fails to show how her case differs from other similarly situated *black* employees.

As explained *infra*, the problem with this statistical, group-based method of proving intentional discrimination is that it necessarily assails the integrity of the five-year monitoring system that the consent degree created to resolve future claims of *class-wide* discrimination. I retained jurisdiction to enforce the consent decree; that includes the power to protect the five-year monitoring system against state court actions which have the effect of thwarting its operation.

## I. *Background*

The history and framework of the consent decree is well documented elsewhere, *see Huguley v. General Motors Corp.*, 128 F.R.D. 81 (E.D.Mich.1989); *aff'd*, 925 F.2d 1464 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 304, 116 L.Ed.2d 247 (1991), and need not be repeated here. Suffice to say, it is well established that the consent decree prevents any claim "alleging race discrimination in the promotion, pay, demotion, transfer, layoff, recall or other personnel decisions" by a covered GM employee arising from conduct "occurring prior to the date of the Decree and any future effects of such past occurrences." Consent Decree at 11–12. The consent decree became effective on October 15, 1991 when the U.S. Supreme Court denied a petition for a writ of certiorari. *See Huguley v. General Motors Corp. (Perry)*, 999 F.2d 142, 148 n. 4 (6th Cir.1993).

Dunn does not contest this interpretation of the consent decree, but instead argues that her complaint, at least in part, seeks damages for conduct occurring *after* the October 15, 1991 cut-off date. She correctly argues that post-decree acts of discrimination against her as an individual are not covered by the consent decree. *Huguley*, 128 F.R.D. at 85 (noting that "the relief for individual claimants only releases General Motors for practices complained of up to the date of approval the consent decree"); *see also Perry*, 999 F.2d at 149 (noting that truly new acts of discrimination would not be covered by the consent decree); *Perry*, 1993 WL 276790, at *2, 1993 U.S.Dist. LEXIS 4134, at *5 (recognizing that new acts of discrimination are not covered by the consent decree). But she also recognizes that the present effects of pre-decree discrimination are covered by the decree. In other words, individual disparate treatment today would only escape the preclusive effect of the consent decree if the discriminatory act occurred after October 15, 1991. *See Perry*, 999 F.2d at 148–49.

I accordingly asked Dunn's attorney to detail specific conduct which Dunn alleges constitutes individual racial discrimination not covered by the consent decree. She filed a brief complying with this request and GM has responded.

## II. *Alleged New Acts of Discrimination*

Dunn presently holds a position as an associate statistician/analyst in a "Service Administration Department" within GM. She was placed in this position in November 1991 as a fifth-level employee. She emphasizes that she began working for GM in June 1969 and holds a masters' degree in administration. She also claims to have an excellent attendance record.

The alleged new acts of discrimination all share a common thread; Dunn points to number of allegedly less qualified white GM employees—both employed within her department and elsewhere—who have fared better at GM than she.

Much of her brief is devoted to the recent employment history of three white employees who worked with Dunn in the Service Ad-

ministration Department: (1) Janine Pouget was a fifth-level employee in the Service Administration Department when Dunn joined that department in 1991. Dunn alleges that Pouget has received more favorable treatment in several specified ways, despite the fact that Pouget has less education than Dunn, less seniority, and "a terrible attendance record." (2) Melinda Gruetman apparently was a sixth-level statistician analyst. She was promoted to the seventh level shortly after receiving a bachelor's degree in December, 1991. Dunn claims that she was placed in Ms. Gruetman's position in August of 1992. She claims that she is being treated differently than Ms. Gruetman because she only carries the title of *associate* statistician analyst and is classified at a level-five position. (3) Tammy Vargo was promoted to statistician analyst in June 15, 1992 upon obtaining her bachelor's degree.

Dunn also compares her employment experience with GM's treatment of white employees outside her department. She points to seven white employees who, she alleges, have recently been promoted or otherwise have received better treatment than she. Further, she claims that she met the qualifications and applied for a position on the "People Strategie Team" in April 1993. She claims that she was not selected and that all the employees on the team are white. Finally, Dunn argues that GM has refused to promote her to a statistician analyst position which has been open since June 14, 1993.

### III. *Analysis*

General Motors argues at length that plaintiff's above-mentioned examples of post-decree conduct fail to make out an individual disparate treatment claim. This misses the point. Dunn's allegations might very well make out an intentional claim discrimination were there no consent decree involved in this case. *See, e.g., McMahon v. Libbey–Owens–Ford,* 870 F.2d 1073, 1077 (6th Cir.1989) (noting that courts have allowed individual disparate treatment plaintiffs to use similar statistics to establish a prima facie case of age discrimination); *Diaz v. AT & T,* 752 F.2d 1356 (9th Cir.1985) (noting that pattern of discrimination certainly "is probative of mo-

tive and can therefore create an inference of discriminatory intent with respect to the individual employment decision at issue"); *see also Barnes v. Gencorp Inc.,* 896 F.2d 1457, 1466, 1469 (6th Cir.1990) (upholding the use of statistics to establish a prima facie case, but noting that the statistics there did "not tend to establish that age played a factor in any *particular* decision"). However, that is not the question before me; I am not being asked to consider whether Dunn has made out a claim. I merely am being asked to consider whether the consent decree bars Dunn's state court action.

### 1. *Present Effects of Past Discrimination*

The consent decree bars any claims of discrimination arising from conduct "occurring prior to the date of the Decree and any future effect of prior occurrences." Consent Decree at 12. I find that the so-called specific incidents of individual racial discrimination that Dunn alleges, in fact, are the present effects of past discrimination.

Ruth Dunn's allegations of discrimination are not new. She alleges in her state court complaint that since 1987, and probably earlier, she has been denied promotions, denied merit pay increases, and been transferred to various departments because of her race. She testified in her deposition that she has been "complaining about seeking a promotion" to the sixth level since 1980. In addition, she was listed as a potential anecdotal witness in the original class action suit and later filed an objection to the proposed consent decree.

Given this history, I find it probable that whatever hindered Dunn's employment progress over the years before the consent decree came into effect—whether it was racial discrimination or something else—continued to hinder her advancement after the October 15, 1991 cut-off date. Nothing has changed over the years. I recognize the remote possibility that Dunn's alleged failure to advance is due to numerous separate acts of intentional discrimination directed against her as an individual. But if that were the case, I would have expected *some* evidence specifically showing that someone—perhaps someone within her department—deliberately

treated *her* differently because she is black. Dunn's failure to provide any specific evidence makes it reasonable to infer that whatever caused her allegedly slow advancement predates the consent decree.

That the cause of Dunn's allegedly slow advancement can be traced to a time before the consent decree bars her state court action. Dunn cannot seriously maintain that an act of individual disparate treatment occurs every time a white employee is promoted over her *and* that these alleged acts of discrimination are unrelated to pre-decree discrimination. The U.S. Court of Appeals for the Sixth Circuit rejected a similar attempt to sidestep the consent decree in *Perry*:

> [Perry] contends that under the Elliot–Larsen Act, each day that a person occupies a lower position than he/she would have occupied, absent prior discrimination, that person suffers a new act of discrimination. But the consent decree clearly bars claims stemming from future effects of past discriminatory conduct. Construing, for example, the alleged effect of a discriminatory action taken in 1986 as another daily and continuing discriminatory act in 1992, would directly contravene the clear intent of the consent decree.

*Perry*, 999 F.2d at 148–49.

2. *Permitting Dunn's claim would undermine the class-wide affirmative action scheme embodied in the computer monitoring system and the individual monitoring review process.*

As noted above, Dunn was given the opportunity to offer present-day, post-decree evidence to support her individual disparate treatment claim. Part of her response was to compare her own work-related abilities and achievements to those of seven white employees presumably employed outside her department who, she claims, are similarly situated. This statistical, group-based method of proving individual disparate treatment necessarily assails the integrity of the five-year monitoring system that the consent decree created to resolve future claims of class-wide discrimination.

Whether these allegations of recent discrimination would suffice ordinarily to make out a claim of intentional discrimination is not at issue here. This group-based method of proof would tend to show that *blacks* as a group are being discriminated against. That is, this method of proof would tend to show *group-based* disparate treatment. But, it would not directly show that *Dunn* is being discriminated against because she is black. I admit that statistics tending to show that black employees of General Motors are discriminated against would help Dunn prove a case of intentional discrimination. But this method of proof presents a problem here, where the monitoring system assures that blacks as a group are not being discriminated against.

Allowing Dunn to continue her action in state court with no more than the group-based evidence she so far has presented might force the state court to rule either that the statistics suffice to support a claim of individual disparate treatment or that they do not. Permitting the state court to rule that the group-based evidence—with nothing more—supports an individual claim of race discrimination would effectively undermine the affirmative action monitoring system approved by this court and affirmed by the Court of Appeals for the Sixth Circuit. In essence, monitoring-system approved statistics, although sanctioned by a federal court, nevertheless would suffice to establish a state law discrimination claim. This is a roundabout way of attacking the monitoring system. I cannot permit that. I retained jurisdiction to enforce the consent decree; whether there are problems with the monitoring system is for me to decide.[1]

---

1. Permitting the state court action also would potentially interfere with the workings of the Individual Monitoring Review Panel established pursuant to the consent decree. Consent Decree at 42–45. This Panel is designed to address the concerns of employees who disagree with their grouping or ranking. As stated in a letter to all Cadillac Division employees, the process enables "all classified salaried employes [to] request a review of their concerns relative to their Personal Development Plan (PDP) or any *process* that may be used to determine their compensation treatment." Letter from Robert C. White, Divisional Director of Human Resources to All Sala-

## IV. *Conclusion*

The Anti–Injunction Act permits federal courts to enjoin state court actions when necessary to "aid in [the federal court's] jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283 (1988). I find that Ruth E. Dunn's allegations of employment discrimination fall within the preclusive scope of the consent decree. *See Perry,* 999 F.2d at 145. I also find that her attempt to prove individual disparate treatment by relying solely on class-wide evidence of discrimination undermines the five-year affirmative action monitoring program.

For the foregoing reasons, IT IS ORDERED that defendant's motion to enforce the consent decree and to enjoin Ruth E. Dunn from pursuing state court proceedings involving claims of race discrimination is GRANTED.

An Order of Judgment containing the injunction may be presented.

ried Employees, April 1, 1992 (emphasis added). Dunn's allegations do not specify whether her alleged disparate treatment is due to a specific process or to something more invidious, such as the discriminatory motives of a particular supervisor. Insofar as she complains about a promotion process, a state court action would interfere with the workings of the Individual Monitoring Review Panel. That, in turn, would interfere with the consent decree.