**Dennis Hazen HUGULEY, et al., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

No. 83–CV–72864.

United States District Court, E.D. Michigan, Southern Division.

June 28, 1994.

Cheryl Bloom, Bloom & Bloom, Farmington Hills, MI, for Ruth E. Dunn.

Barbara Berish Brown, Paul, Hastings, Janofsky & Walker, Washington, DC, for defendant.

## OPINION

FEIKENS, District Judge.

This motion for clarification of the Consent Decree ("Decree") arises out General Motors Corporation's ("GM") December 1, 1993 sale of its Allison Gas Turbine Division to a company called AEC Acquisition Company ("AEC"). GM has asked me to decide whether GM or the new company, Allison Engine Company ("Allison"), are bound by the provisions of the Consent Decree which resolved this race-discrimination suit effective October 15, 1991. GM admits that Allison Gas Turbine Division was bound by the Consent Decree before it was sold, but contends that the Consent Decree no longer applies to Allison because it now belongs to AEC. Plaintiffs—the class of all black salaried GM employees in Michigan, Ohio, and Indiana—claim that the Consent Decree should follow Allison to its new owners under the doctrine of successorship; they maintain that Allison—although no longer owned by GM—nevertheless is bound by the Decree's provisions. They also argue that GM still should be liable for Consent Decree violations at Allison. For the reasons stated below, I find that Allison remains bound by the provisions of the Consent Decree despite its new ownership and that GM remains liable for Decree violations at Allison.

### I.

Plaintiffs originally brought this class-action suit in July 1983, claiming that GM had discriminated against them on the basis of their race with respect to promotions, demotions, layoffs, recalls, pay, transfers, and other subjective personnel decisions. The case never went to trial. Instead, negotiations between the parties resulted in an agreement to settle the lawsuit and produced a rather lengthy settlement document now known as the Consent Decree. *See Huguley v. General Motors Corp.*, 128 F.R.D. 81 (E.D.Mich. 1989), *aff'd*, 925 F.2d 1464 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 304, 116 L.Ed.2d 247 (1991). This motion is the most recent of a series in which GM has asked me either to enforce or interpret that Consent Decree. *See Huguley v. General Motors Corp. (Dunn)*, 842 F.Supp. 941 (1993); *Huguley v. General Motors Corp. (Perry)*, No. 83–CV–72864–DT, 1993 WL 276790, 1993 U.S. Dist. LEXIS 4134 (E.D.Mich. Jan. 21, 1993), *aff'd*, 999 F.2d 142 (6th Cir.1993); *Thomas v. General Motors Corp.*, No. 91–CV–76068–DT, 1992 WL 521527 (E.D.Mich. Jan. 31, 1992).

The Decree's intricate details are documented elsewhere, *see* 128 F.R.D. 81, and need not be repeated here. For present purposes, however, it is worth noting that plaintiffs gave up their prior individual claims of race discrimination in return for extensive *class-wide* relief. One part of this relief is an innovative affirmative-action computer-monitoring system designed to statistically track

promotions and discretionary pay increases for black and white salaried employees throughout the five-year life of the Consent Decree. The computer-monitoring system then compares the statistics for black salaried employees against the statistics for similarly ranked white employees. GM must redress significant shortfalls in promotions and salary increases.

I held oral argument on GM's clarification motion on January 27, 1994.[1] During the course of that hearing, it became apparent that a proper adjudication of this issue required that Allison be given the opportunity to be heard. Allison accordingly was informed of the dispute but has declined the opportunity to address the court.

## II.

As an initial matter, I note that there is nothing inherent in either class-wide relief or consent decrees that precludes me from ruling that Allison is bound by the Consent Decree under the doctrine of successorship liability. *See, e.g., Bates v. Pacific Maritime Ass'n,* 744 F.2d 705, 709 (9th Cir.1984) (holding that successor must comply with consent decree which afforded class-wide relief). I accordingly must determine whether successorship liability is appropriate in this particular case.

■ The U.S. Court of Appeals for the Sixth Circuit has set out nine factors courts should consider when deciding whether to impose successor liability in employment discrimination cases. *EEOC v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086 (6th Cir.1974). These are: (1) whether the successor had notice of the discrimination charge, (2) the ability of the predecessor to provide relief, (3) whether there has been a substantial continuity of business, (4) whether the new employer uses the same plant, (5) whether the new employer uses the same work force or substantially the same work force, (6) whether the employer uses substantially the same personnel, (7) whether the same jobs exist under substantially the same working conditions, (8) whether the

successor uses substantially the same machinery, equipment, and methods, and (9) whether the successor produces substantially the same product. *Id.* at 1094; *see also Musikiwamba v. Essi, Inc.,* 760 F.2d 740, 750 (7th Cir.1985). The successor's ability to provide relief is another factor that courts must consider. *See, e.g., Criswell v. Delta Airlines, Inc.,* 868 F.2d 1093, 1095 (9th Cir. 1989). That a consent decree is involved in this case means that I also must consider whether the imposition of liability is consistent with Allison's legitimate expectations and the interests of the plaintiffs under the Decree. *Bates,* 744 F.2d at 709; *see also Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir.1983) (stating that consent decrees "should be strictly construed to preserve the bargained for position of the parties").

■ There is no serious dispute in this case about *MacMillan* factors (3) through (9): Allison uses the same plant, the same work force, the same supervisory personnel, and the same machinery as the former Allison Gas Turbine Division. The first *MacMillan* factor—whether the successor had notice of the discrimination charge—also is not an issue in this case both because the discrimination charge and the Consent Decree are public knowledge and because the upper management of Allison Gas Turbine Division for the most part have continued as management under the new owners. This dispute therefore turns on whether GM or its successor Allison is able to provide adequate post-sale relief and whether imposition of liability is consistent with Allison's legitimate expectations and the interests of the plaintiff class.

Plaintiffs claim that the Consent Decree properly construed requires that Allison continue a "mini" version of the computer-monitoring system for the remainder of the five-year life of the Consent Decree. Like the larger version, the mini-computer-monitoring system would compare the statistics for black salaried employees at Allison against the statistics for similarly ranked white salaried em-

---

1. Both parties generously consented to hold the hearing in this case before a law student audi-

ence at Wayne State University Law School.

ployees. Allison then would be required to redress any significant shortfalls in promotions and salary increases. I must determine whether this proposed mini-monitoring system will further the goal of providing the type of relief to which the parties originally agreed, whether it meets Allison's legitimate expectations, and whether implementation of such a system is feasible.

GM's first argument against the proposed mini-monitoring system is that it fails to provide the type of relief originally contemplated. GM explains that the computer-monitoring system adopted in the Consent Decree is expressly designed to address discrimination on a class-wide basis only. Black salaried employees at Allison therefore should enjoy the benefits of the Consent Decree only if the Allison statistics are included with the entire batch of GM statistics gathered from the three-state area. GM maintains that permitting the Allison plaintiffs—or plaintiffs employed at other former "pieces" of GM—to receive the benefits of the affirmative-action computer-monitoring system using only statistics from their particular sub-unit effectively would defeat the Consent Decree's goal of providing class-wide relief.

There is force to this argument. The Consent Decree permits GM to address many race-discrimination issues on a class-wide basis and relieves GM of addressing these issues on an individual or division-by-division basis. *See, e.g., Dunn,* 842 F.Supp. at 944 (noting that plaintiff may not base her race-discrimination claim on monitoring-system approved statistics); *Perry,* 999 F.2d at 146–47 (noting that the Consent Decree shields GM from individual discrimination claims arising or attributable to acts occurring prior to the effective date of the Decree). GM and its various successors will tend to lose the benefit of this bargain if they must begin to address discrimination charges, if not quite on an "individualized" basis, then on the basis of more and smaller groups.

The problem with GM's argument, however, is that it focusses exclusively on the burden that a mini-monitoring system would place on GM and its successors and fails to appreciate the ways that *not* imposing a mini-monitoring system on Allison will tend to undercut the Consent Decree's goal of providing class-wide relief. Suppose, for example, that the black salaried employees at a particular GM division presently fare worse than the average GM salaried employee in the three-state area. Such a scenario is entirely possible and would not necessarily violate the Consent Decree: part of the bargain was that GM would be able to offset poor statistics in one division with good statistics in another. *See* Consent Decree at 30 ("Attainment of the desired mix of discretionary salary increases or promotions is predicated on the assumption that some facilities will exceed the goals established, some will meet them exactly, and others will fall short."). Suppose that GM then sold that particular division. Imposing a mini version of the computer monitoring system on the successor division accordingly would benefit the group of plaintiffs who work in that former GM division (assuming that this group of plaintiffs has fared poorly enough to warrant affirmative action under the Consent Decree). The plaintiffs at the sold division in essence would be getting more than they bargained for. On the other hand, the statistics for the rest of GM initially would be improved (GM having rid itself of a division with poor statistics), and GM would be free to treat the remainder of the remaining black employees worse than before. (For example, it could promote fewer black employees in the divisions that remain with GM because GM no longer would have to compensate for divisions with poor statistics.) Under this analysis, the end result is a wash; neither party does any better, but some plaintiffs do better and others do worse than before the sale.[2]

Not requiring a mini computer monitoring system, on the other hand, would produce a different result depending on whether the sold division's statistics were above or below the average. For example, if black salaried employees at pre-sale Allison fared worse than average, its sale will raise the average

---

**2.** A similar analysis applies if the statistics at the sold division are statistically better than average. The end result is a wash, but some plaintiff will do better and some will do worse.

statistics for the remainder of GM black salaried employees. GM, once rid of a division with poor statistics, would be free to treat the remainder of black salaried employees on average worse than it did before. The plaintiffs as a group therefore would lose if GM sells a division with poor statistics. By a similar argument, plaintiffs as a group would gain if GM sold a division with good statistics.

Thus, although the Consent Decree's goal of relieving GM of piecemeal discrimination charges will be defeated with a mini-monitoring system, another Decree goal—affording relief to the *entire* plaintiff class—will be defeated without some sort of mini-monitoring system. The question therefore, is how to choose between the two scenarios.

Attempts to ascertain the intent of the parties unfortunately fail to resolve the dilemma. It is clear that the plaintiffs gave up their prior individual claims of race discrimination in return for extensive class-wide relief. Beyond that, the intent of the parties regarding the particular situation at hand is far from clear. Plaintiffs for their part maintain that the parties intended that all members of the plaintiff class would enjoy the relief afforded by the computer-monitoring system—even if GM happened to sell various sub-units. They point to language in the Consent Decree which explicitly binds "the parties and their agents and successors."

GM, in turn, notes that the parties explicitly considered and rejected as unworkable the idea of requiring statistical analyses, goals, and adjustments for individual facilities, divisions or departments at GM. *See* Consent Decree at 30 ("The Company's performance with respect to discretionary salary increase and promotion monitoring shall be measured on the basis of the increases or promotions made at all facilities covered by this Decree without regard to whether or not individual facilities have exceeded, met, or not attained proportional discretionary salary increases or promotions."). It accordingly maintains that the parties did not intend successors like Allison to be bound by the Decree and that the "successorship" provision in the Consent Decree upon which plaintiffs rely makes sense only if another company were to ac-

quire all or substantially all of GM's operations within the three-state area covered by the Decree. Instead, GM argues that divesting itself of Allison is much like shutting down or reducing the level of activity at that particular division, a right that GM expressly reserved in the Consent Decree.

I acknowledge the merit of GM's various arguments. Several factors nevertheless lead me to conclude that imposing liability on Allison is the best way to effectuate the goals of the Consent Decree. First, I note that Consent Decree language stating that GM's performance with respect to discretionary salary increases and promotions is to be evaluated "without regard to whether individual facilities have exceeded, met, or not attained proportional discretionary salary increases or promotions" does not alone refute plaintiffs' claims that the Consent Decree binds Allison. Turning GM's argument around, the parties also did not contemplate that GM could *exclude* the statistics of a still-functioning subunit in the three-state area. As I discussed above, *excluding* the statistics of a particular group without setting up a "mini" version of the computer monitoring system has the effect of defeating the goals of group-based relief.

I also reject GM's attempt to analogize its sale of Allison Gas Turbine Division to the shutting down or reducing the level of activity at that particular division. This analogy proves too much: any sale of a division or company can be fashioned as "shutting down … that particular division" and restarting the work under new owners. Accepting this argument would force me to reject the principle of successor liability altogether.

Finally, I note that the downside of binding GM successors to the Consent Decree—the fact that GM and its successors will no longer enjoy the benefits of a single, group-based monitoring—is a product of GM's own doing. GM could have avoided the imposition of a mini-monitoring system by simply retaining its ownership of Allison.

I also am skeptical of GM's claims that adopting a mini-computer-monitoring system at Allison is not feasible because the small sample size at a facility like Allison would

make the development of a new logit model too expensive and burdensome. A quick answer to this is that GM caused its own discomfort when it sold Allison. Furthermore, it is likely that GM overstates the burden involved in the undertaking. The statistical analysis required, although somewhat sophisticated, already has been developed for GM as a whole. The analysis essentially is no more rigorous than the threshold showing of discrimination in a disparate impact case. Much of the same computer programming that GM presently employs conceivably could be used for a mini-monitoring program at Allison.

Still, I need not decide the precise details of how Allison and GM should go about complying with the requirements of the Consent Decree. I leave that for the parties and Allison to work out. It may in fact turn out that imposing a mini-monitoring system on Allison is impractical and that another solution better serves the goals of the Consent Decree. I will address any disputes arising out of the attempt to comply as they arise. I merely have been asked whether a division of GM—once bound by the Consent Decree—can avoid the provisions of the Consent Decree simply because its owner has changed. It cannot.

### III.

■ GM finally argues that it retains no power to influence personnel decisions at Allison and accordingly should not be held liable if Allison violates the Consent Decree. I disagree with this argument. The group of plaintiffs at Allison has given up many of their rights to litigate discrimination claims against GM. GM cannot now divest itself of the obligations it undertook under the Consent Decree by selling its divisions to purchasers unwilling or unable to enforce the terms of the Decree. Were GM concerned over its lack of influence over Allison personnel decisions, it could have taken steps to bind Allison. GM and Allison, not the plaintiffs at Allison, should bear the burden if Allison fails to comply.

### IV.

For the foregoing reasons, I find that both the General Motors Corporation and Allison Engine Company remain bound by the provisions of the Consent Decree I entered in this case.